In the Matter of PROCESS–MANZ
PRESS, INC., a corporation,
Bankrupt.

No. 62 B 9414.

United States District Court
N. D. Illinois, E. D.

Dec. 4, 1964.

Norman H. Nachman, Joseph Stein, Rothbart, Stein & Moran, Chicago, Ill., for A. J. Armstrong Co.

William S. Collen, Collen & Kessler, Joseph L. Kadison, Chicago, Ill., for trustee.

Irving H. Goldberg, Goldberg, Weigle, Mallin & Rivkin, William B. Davenport, Raymond, Mayer, Jenner & Block, Edward P. Madigan, Madigan & Thorsen, Chicago, Ill., for certain unsecured creditors.

Robert A. Downing, Sidley, Austin, Burgess & Smith, William I. Goldberg, Hopkins, Sutter, Owen, Mulroy, Wentz & Davis, Bernard E. Lyons, Schiff, Hardin, Waite, Dorschel & Britton, Harry M. Brostoff, Aaron, Schumberg & Hess, Seymour Price, Charles E. Herzog, Chicago, Ill., for certain reclamation creditors.

Carroll A. Teller, Teller, Levit & Silvertrust, Chicago, Ill., for bankrupt.

CAMPBELL, Chief Judge.

This matter is before me on the petition of A. J. Armstrong Co., Inc., (hereinafter referred to as Armstrong) seeking review of two orders entered by the referee, one on November 27, 1963, and the other on December 2, 1963. The order of November 27 (1) overruled the motion of Armstrong challenging the summary jurisdiction of the Court; (2) invalidated a chattel mortgage and trust deed executed as part of a transaction entered into on December 14, 1961 by Armstrong and the bankrupt securing a loan of $2,500,000; (3) subordinated the claim of Armstrong (asserted to exceed $3,750,000) to the claims of all general

creditors herein filed and allowed (in an approximate amount of $1,181,000); and (4) directed a sale of all of the assets of the bankrupt free and clear of the liens asserted by Armstrong. The order of December 2, implemented the sale portion of the order of November 27, by fixing the date of sale and by authorizing the trustee to employ an auctioneer to sell the assets. The dates set for the sale were February 11 through February 16, 1964. The sale was not held, however, by reason of the objection of Armstrong thereto and by the compliance by Armstrong with conditions of stay of said orders imposed by the referee and affirmed, in turn, by this Court and the Court of Appeals. The stay conditions were that Armstrong post two corporate surety bonds totaling $3,000,000, one in the amount of $2,000,000, securing the trustee and the unsecured creditors herein, and one in the amount of $1,000,000, securing the reclamation petitioners claiming under conditional sales contracts or leases. The corporate surety bonds were posted by Armstrong on February 7, 1964, three days before the first sale date.

The key order under review is, therefore, the order of November 27, 1963. This order, containing detailed findings and conclusions of the Referee, is 66-pages and was entered after many months of hearings before the Referee. Both the trustee and Armstrong filed lengthy briefs before the Referee prior to the entry of this order, and both parties have likewise filed lengthy, detailed briefs before me. I have just concluded my review of the orders of the Referee under challenge, the pleadings, the transcript of the testimony and the exhibits upon which the orders were based, the petition for review by Armstrong and the briefs of the parties.

Armstrong's contentions here are basically the same as they were before the Referee, namely, that the Court does not have summary jurisdiction to adjudicate the claim of Armstrong on the merits. In addition, Armstrong now asserts that the findings of the Referee are not supported by competent evidence in the record. Armstrong also asserts that the Referee should have made additional or contrary findings upon the conflicting evidence before him. Armstrong also contests the order of the Referee on the merits, i. e., the holding that the transfers of December 14, 1961, were fraudulent conveyances under Sections 67, sub. d and 70, sub. e of the Bankruptcy Act and the holding that Armstrong's entire claim should be subordinated to the claims of all general creditors filed and allowed herein.

A review of the pertinent facts necessary for an understanding of the legal issues is hereinafter set forth.

### The Key Participants

The three key participants involved are Process-Manz Press, Inc., the bankrupt; Process Lithographers, Inc., and A. J. Armstrong Co. Inc.

Process-Manz Press, Inc. (hereinafter referred to as "Manz" or "the bankrupt") was engaged in the printing business and had been so for approximately 90 years. It occupied a large building situated on more than one-half of a city block in Chicago at the date of bankruptcy, November 23, 1962. It had formerly been known as Manz Corporation but had changed its name to Process-Manz Press, Inc. in May, 1962.

Process Lithographers, Inc., (hereinafter referred to as "Lithographers") is a New York corporation which was engaged in the printing business in New York City. It has now been adjudicated a bankrupt in New York.

Armstrong is engaged in the finance business in New York. It is successor to City Industrial Company, a partnership formerly engaged in the finance business.

### The Contract of March 20, 1961 for the Sale of the Major Part of the Manz Stock

On March 20, 1961 the three principal shareholders of the bankrupt, Morrie Moss, Lester Neumann and Louis Kessler, owners of in excess of 91% of the stock of Manz, entered into a written

contract for the sale of all of their stock, both preferred and common, to Lithographers. The contract provided for payment without interest of the sum of $2,236,083.04 to the three principal shareholders in monthly installments over a period of four years from the date of the contract, with two exceptions: (1) Kessler was to be paid in full by October 15, 1961; (2) Neumann was to receive a substantial payment on account ($172,833.33) on August 1, 1961. The contract provided for all of the then officers and directors of Manz to resign. They did so resign and new officers and directors were elected by Lithographers on or about March 20, 1961.

Lithographers immediately on March 20, 1961 assumed full ownership and control of Manz, subject to a restriction against the sale or hypothecation of the assets of Manz stipulated in the contract. The restriction, in effect, prohibited the sale or hypothecation of the assets of the bankrupt unless one-half of the proceeds of the sale or loan were paid to the selling shareholders in part pre-payment of the sale price of their stock.

The new officers of the bankrupt were the same as the officers of Lithographers, and to all intents and purposes Lithographers was the parent of the bankrupt. The contract of March 20, 1961 vested full voting rights of shareholders in Lithographers.

Monthly payments as provided in the contract were made by Lithographers to the shareholders until August 1, 1961. At this time and prior thereto, Lithographers was in financial difficulty and was not paying its debts in the regular course of business. It was unable to pay the full installment of $172,833.33 due to Neumann on August 1, 1961 and paid only $50,000 on account. The balance of this installment was not paid to Neumann until October 16, 1961.

### The Loan of October 4, 1961

On October 4, 1961 the new officers of Manz (Roskin and Young) entered into an agreement with Armstrong for a secured loan of $1,000,000 in behalf of Manz. Of this, $500,000 was to be advanced to Manz, and $500,000 was to be held by the lender in escrow pursuant to special permission granted by two of the selling shareholders (Neumann and Moss) for the mortgaging of the assets of the bankrupt. The $500,000 withheld was to be turned over to the selling shareholders by Armstrong in the event of nonpayment of the loan by a designated date.

From the proceeds of the loan of $500,000, the bankrupt advanced $289,231.75 to Lithographers, which the latter used to pay the balance due to Neumann in the sum of $122,833.33 for the installment of August 1, 1961.

### Negotiations with Armstrong for $2,500,000 Loan

After the loan of October 4, 1961 negotiations were conducted between Armstrong and the bankrupt for a loan of approximately $2,500,000 to be made upon the property of the bankrupt. During said negotiations Armstrong required as conditions to the making of the loan (1) 100% of the shares of stock of Manz to be deposited with it as collateral; and (2) an exclusive contract for all of the accounts receivable financing, which would continue in effect so long as the bankrupt was indebted to Armstrong.

On October 31, 1961 the bankrupt signed a contract for the assignment of all of its accounts receivable to Armstrong. Under this arrangement Armstrong received copies of all invoices and received all the income generated by Manz and in return made advances to Manz in amounts solely determined by Armstrong.

On November 6, 1961 Manz, Lithographers and Armstrong entered into a written agreement whereby Lithographers assigned to Armstrong all of its interest in and to the contract of March 20, 1961 with the selling shareholders of Manz as collateral for the proposed loan. On November 6, all shares of stock of Manz paid for and acquired by that date were delivered to Armstrong by

Lithographers. Armstrong thereby acquired all the interest and rights of Lithographers under the contract of March 20, 1961 and in the shares of stock of Manz covered by that contract. Armstrong also acquired the right to make the payments due on the contract of March 20 in the event of any default by Lithographers.

## The Loan of December 14, 1961

On December 14, 1961 Manz executed and delivered to Armstrong a trust deed transferring its real estate, a chattel mortgage transferring certain of its personal property (exclusive of inventory and work-in-progress) and a promissory note for $2,500,000 with interest at 12% per annum.

In consideration of these transfers and the delivery of the promissory note, Armstrong on the same date disbursed the proceeds of the $2,500,000 loan as follows: (1) it repaid itself the sum of $500,000 borrowed from it by Manz on October 4, and released to itself the balance of that loan held in escrow pursuant to the loan agreement; (2) it paid itself $11,666.67 in interest on the loan of October 4; (3) it paid $2,525 to Melvin Hirsch, its Vice President and General Counsel, for title expenses and attorney's fees; (4) it delivered two checks—one for $814,432.58 and one for $624,122.49, or a total of $1,438,555.07—payable to the order of Schwartz, Nathanson and Frank, attorneys for Manz, to George Schwartz; and (5) it issued a check for $547,253.26, payable to Manz (representing the net cash proceeds actually received by Manz). The two checks delivered to Schwartz were delivered with directions and on condition stipulated by Armstrong that the amount of the first check be paid over to Moss and the amount of the second check be paid over to Neumann to prepay to Moss and Neumann the respective total balances due to them on the contract of March 20, 1961 and that George Schwartz receive in return from Moss and Neumann (or their escrow agent) the balance of the shares of stock of Manz, covered by these payments and deliver them to Armstrong as collateral for its loan in accordance with the terms of the loan.

Upon receipt of the two checks Schwartz exchanged them for two certified checks in amounts identical thereto, payable respectively to Moss and Neumann. Schwartz then delivered these certified checks to Moss and Neumann from whom he had already obtained the remaining balance of stock (both preferred and common) and for whom he was acting as escrow agent. Schwartz then certified to Armstrong that he had "this day made payment to the selling shareholders under the agreement of March 20, 1961 of the sums which we computed to be the balance provided for under said agreement", and further, that in his opinion, "there is no prohibition or restriction of any nature under the terms of said agreement which would prevent Manz * * * from mortgaging its assets or assigning its accounts receivable." Schwartz delivered to Armstrong the shares of Manz stock which he had received from Moss and Neumann. These shares were, as were all other shares of Manz stock previously delivered to Armstrong, endorsed in blank with blank signed powers of attorney. Of the net cash proceeds of the loan actually received by it—$547,000—Manz transferred $200,000 to Lithographers.

On December 14, 1961 several creditors of Manz had claims against Manz which have never been paid and are still due and owing.

## Stock Redemption

On December 5, 1961 Melvin Hirsch, Vice President and General Counsel of Armstrong, arranged with local counsel for Armstrong in Chicago, for the Articles of Incorporation of Manz to be amended so as to authorize the redemption of preferred stock (Trustee's Ex. 87). Said authorization was given by the officers of the bankrupt at the direction of Armstrong. At the same time, counsel for Armstrong drafted a state-

ment of redemption and cancellation of 282,000 shares of preferred stock. This statement was signed on December 22, 1961 and filed with the Secretary of State of Illinois on December 29, 1961 at the direction of Armstrong. The Certificate of Redemption reflects the amount of $1,979,640 paid by Manz to Lithographers for these shares. The books of Manz, however, show the transaction as follows: Manz redeemed 282,000 shares of its preferred stock from Lithographers at $7.23 per share or a total of $2,038,860. The bankrupt subsequently made a correcting entry of $59,220 on its books to adjust the redemption price down to $7.02 per share. This made the final redemption price for the 282,000 shares $1,979,640. Of this amount $1,438,555.07 represents the amount paid to Moss and Neumann. This amount was treated as an advance to Lithographers. The difference between the two amounts—$541,084.93—was credited to the cancellation of indebtedness owing to Manz in an equivalent amount by Lithographers for cash advances made to Lithographers and for printing jobs done by Manz for the account of Lithographers.

Financial Condition of Bankrupt Before and after the Commencement of Its Relationship with Armstrong

Prior to its dealings with Armstrong, Manz had no mortgages on any of its property except for balances due on conditional sales contracts for purchase of specific items of property. Manz did not discount its accounts receivable but relied entirely upon bank financing at the usual and customary rates charged by banks. The annual volume of Manz' business was $6,000,000. However, since January, 1961 Manz had been slow in paying its bills to trade creditors. Moreover, it had sustained losses in the calendar years 1958 through 1960 inclusive. The combined amount of the loss in 1959 and 1960 was $468,953.21.

The obligations of Manz to its unsecured creditors on December 14, 1961 were approximately $588,000.

Following the transaction of December 14, 1961 the financial condition of Manz grew progressively worse from month to month. Within 11 months from that date, accounts payable, exclusive of taxes, wages and indebtedness to Armstrong, aggregated approximately $1,181,000. Within 30 days from the date of the loan, Manz was in default among other reasons by its failure to maintain the required ratio of net working capital of a minimum of $400,000 and by its failure to maintain a minimum net worth of $1,300,000 as required by the loan agreement. Additional defaults under the loan agreement thereafter accrued. Manz made payments on the loan in March, April and May, 1962 and defaulted entirely on the payment due in June, 1962.

Armstrong made advances to Manz on accounts receivable in round figures without reference to the accounts receivable financial contract of October 31, 1961. The contract which provided originally for a 70% advance was amended on December 14, 1961 to provide for an 80% advance. During the early months under the contract Armstrong advanced substantially less than the agreed percentage, while in the later months Armstrong advanced substantially in excess of the agreed percentage. Manz assigned to Armstrong all of its receivables, including rents from tenants and miscellaneous claims. Included in the miscellaneous claims was a claim for an inventory adjustment (against the selling shareholders) which Armstrong learned about at the last moment, and in the language of its Vice President and General Counsel, "grabbed, in its usual course of grabbing everything." Manz was thereafter dependent solely upon Armstrong for its financial needs and Armstrong supplied to Manz the funds required for payroll and other expenses of operation (including Federal Withholding Tax payments to the District Director of Internal Revenue) as Armstrong deemed it necessary.

Armstrong's Knowledge of the Financial Condition of Manz Both before and after the Loans of December 14, 1961

Armstrong had knowledge of the financial condition of Manz prior to the loan of December 14, 1961 by reason of its examinations of Manz' books and records by its examiners and by conversations its examiners had with the Controller and other personnel of Manz.

Armstrong had continuous knowledge from October, 1961 to the date of bankruptcy (November 23, 1962) of the inability of Manz to pay its debts, in the regular course of business as they matured. During all of this period Armstrong was constantly and fully informed of the pressure brought by creditors of Manz for the payment of their debts.

### Events Preceding Bankruptcy

During the period from June to November, 1962, while Margolies and Fund, president and treasurer, respectively, of Manz were keeping Armstrong fully informed of the continually worsening financial condition of the bankrupt and of the continual pressure by creditors for payment, efforts were being made to effect a sale and leaseback of the Manz real estate. A portion of the proceeds of this anticipated sale and lease-back were to be used to pay creditors a proportionate part of their claims. Margolies and Fund kept Armstrong fully advised of the progress in the negotiations for the sale and lease-back. These negotiations were still pending and a deposit of $65,000 in connection therewith was still being held by attorneys for Manz in New York at the time of the bankruptcy. One of the features of the sale and lease-back was that in the event of a default by Manz thereunder, Armstrong was to have the privilege of leasing the Manz plant for one year.

On November 9, 1962 Margolies proposed to Greenspan at a conference at Armstrong's offices in New York that a meeting of the larger creditors be convened to discuss the agreement for the proposed sale and lease-back of the real estate and to determine what amount the larger creditors would accept as part payment of their account. Greenspan at first questioned the advisability of calling creditors together and "telling each of them in essence what *we* owed to the other one because they might realize that *we* owed them a considerable sum of money" and that "it might worry them." Greenspan, however, ultimately agreed, and on the following November 15, a meeting of the ten largest creditors was held on the premises of the bankrupt. Rubin, Vice President of Armstrong, was also present. At this meeting officers of the bankrupt, creditors and Rubin discussed the proposed sale and lease-back of the real estate of Manz to the Walter J. Schneider Corporation. The sale and lease-back would have required the release of the trust deed by Armstrong and the division of the proceeds of the sale between the creditors as a group and Armstrong. The financial condition of Manz was also a subject of discussion. Creditors were offered participation to the extent of $.10 on the dollar for their claims and some debenture bonds to be issued by Schneider. Rubin made no objection at the meeting to this proposal on behalf of Armstrong and agreed to accept $750,000 for a release of the trust deed on the real estate of Manz.

Four days following the meeting of November 15, or on November 19, 1962, at a conference in the offices of Armstrong in New York, Rubin told Margolies "that after reconsidering the offer that had been made to the creditors the previous Thursday that Armstrong had changed their minds, that they felt *we* were giving too much to the creditors and that they could not go along with the deal as we had outlined it."

On November 20, the following day, Rubin told Margolies at a conference in the offices of Armstrong in New York:

> "that the way we must proceed now in the light of not going ahead with the creditors, giving them the money from the sale and leaseback,

was that Armstrong wanted to take possession of the plant; that the company could then file a Chapter XI proceeding; that when the Chapter XI was filed, that Armstrong would give back the plant one day later. We could then continue to operate the plant and this would give Armstrong the protection that in case the Chapter XI failed for any reason that possession of the plant would revert back to Armstrong."

Margolies objected and requested time to consult an attorney to consider the proposal made by Rubin and also to consider the immediate filing of a voluntary proceeding under Chapter XI of the Bankruptcy Act. To this suggestion Rubin replied that if such proceeding were filed by the bankrupt, Armstrong would withhold all financial assistance, but if Armstrong were permitted first to take possession of the property of the bankrupt, the bankrupt could thereafter file its Chapter XI proceeding and Armstrong would surrender possession to the debtor and lend its aid to its financial rehabilitation.

Armstrong's Activity on November 21–27, 1962 with Respect to the Manz Plant

On November 21, 1962 Armstrong sent its representatives, Spoleti and Fine, to the Manz plant and informed the employees of the Manz plant that Armstrong was taking possession of the Manz premises, machinery, equipment and personal property. The locks on the outer doors were changed by a locksmith employed by Armstrong. A number of signs were posted on the building stating as follows:

"Possession of these premises and the plant, machinery, fixtures, equipment, and personal property of Process-Manz Press, Inc., located and contained herein, is exclusively held by A. J. Armstrong Co., Inc., 850 Third Avenue, New York City, New York, Plaza 2–5300."

Pinkerton guards were employed to police the main entrance to the Manz plant and to patrol the outer premises at periodic intervals. The Manz plant contained six tenants. Four of the tenants had self-contained operations behind closed doors and none of the premises of these tenants was occupied by the guards. Two of the tenants occupied space accessible only through the Manz premises. All these tenants continued to occupy their space and operate their business continuously from November 21, 1962 through November 27, 1962. Employees of Manz finished their day's work on November 21, 1962. Myron Laden, the Manz guards, the maintenance men and the engineers continued to work in the Manz plant, *in the employ of Manz*, performing their usual duties from November 21 to November 27, 1962. These employees were not hired by Armstrong.

The chief function of the guards employed by Armstrong was to remain at the main entrance of the Manz plant and to admit to the premises persons designated upon a list of names and to occasionally police the outer premises. The list of names included the tenants and their employees and the Manz employees who were to be admitted into the premises. On Friday, November 23, 1962, the bindery department of Manz was operated and approximately 24 employees of Manz worked that day. The orders on which they worked were shipped that night. On the same day Armstrong advanced approximately $30,000 to Manz by way of a deposit into its bank account. Two Manz' employees, Virgil Lynch and William Hagen, whose names were not on the Armstrong list, were in the Manz plant on November 23, 1962 without the permission of Armstrong.

The Required Notice of Default

The Installment Note of December 14, 1961 for $2,500,000 contains two paragraphs on page 3 thereof, relating to the right of the holder to accelerate the indebtedness on the occurrence of a default. The first of the two paragraphs provides that in case of default *in any payment* of principal or interest, or any

other indebtedness owing by the debtor, fifteen days notice must be given before acceleration can be made. The immediately following paragraph provides that in the event of any default under the terms of the Chattel Mortgage or Trust Deed securing the note, acceleration, may be made immediately. The chattel mortgage provides that acceleration of the indebtedness not yet due may be made when the holder deems the security unsafe and *then* it shall be lawful for the holder of the mortgage to enter and take possession of the mortgaged chattels.

On the same date that the note was executed, December 14, 1961, Armstrong delivered to Manz a letter which stated as follows:

> "Reference is hereby made to the Installment Note in the sum of $2,-500,000 this date being executed by you and being delivered to us.

> "With respect to the third paragraph on page 3 of said Note, which gives the holder the option, on the happening of default under the Chattel Mortgage or Trust Deed, to accelerate the principal sum owing, we do hereby agree with you that such option to accelerate the principal may be exercised by us only if said default continue for a period of fifteen (15) days after the sending of notice thereof to you by registered mail."

No such notice as required by either paragraph was ever given by Armstrong to Manz.

### The Filing of the Bankruptcy Petition and Events Thereafter

On Friday, November 23, 1962 at 12:45 P.M., an involuntary petition in bankruptcy was filed against Manz. The same afternoon a petition for the appointment of a receiver was served on Manz and notice of that petition was given to Armstrong.

On November 25, 1962 a meeting was held between several of the principal creditors of Manz, the attorneys for the petitioning creditors and Armstrong (represented by Greenspan, Rubin and Harry Margolis). No officer, shareholder or other representative of Manz was present at the meeting. Harry Margolis addressed everyone and stated, "I still think this situation can be worked out with some good management, and I don't see any reason that you have to have a receiver appointed." To this the attorney for the petitioning creditors replied, "if we are talking about new management, shouldn't we have the debtor here?" Margolis replied:

> "What are you worried about the debtor for? * * * we can supply you with any debtor * * * we have 90 or 92% of the stock and we can control the situation."

With respect to new management, Rubin had telephoned Neumann, the former stockholder and officer of Manz, in late October or early November, 1962 at Neumann's home in Miami, and told Neumann that if he "desired to reenter the picture," he "could do so as president."

A few days after the bankruptcy petition was filed, Rubin agreed with Michael Margolies (president of Manz) to pay the fee of the attorneys representing Manz in the Chapter XI proceedings filed by Manz herein. On November 26, 1962 the referee appointed Francis J. Curtis receiver. Upon a review of the order appointing Curtis, at a hearing the next day before me, Armstrong, through its attorney Harry Margolis (who stated that his appearance was special on behalf of Armstrong), addressed the court at length in objection to the appointment of a receiver and in support of the continued operation of the business of Manz by Manz as a debtor. Margolis stated on this occasion as follows:

> "We did not foreclose. We never intended to foreclose. We never intended to wipe out anybody's rights. It was always our intention to protect the unsecured creditors with any possible equity which would exist if the company continued to operate * * *"

"We informed them that in order to protect the assets for everybody, we were just going to take possession, because the debtor had talked about filing a Chapter XI, but did not get around to filing it, and the fact they didn't get around to filing it of necessity to protect everybody's interest, we took possession and said, 'Now, let us sit down and see how we can carry on the operation so that this thing can have continuity.'"

Margolis also proposed that Armstrong finance the operation by the debtor at an interest rate of 7% per annum in lieu of the 12% rate charged Manz. At the conclusion of the oral arguments on the petition for review I affirmed the order of the referee appointing a receiver. Later the same day, November 27, a conference was held between some of the creditors, counsel for the receiver and counsel for Armstrong. At this meeting it was agreed that the receiver would resume operation of Manz' business, that Armstrong would furnish funds for this operation and that the unfinished work in process would be completed. Armstrong agreed to advance $40,000 to the receiver as a cost of administration and agreed to make further advances against receivables generated by the receiver's operation. Armstrong agreed to withdraw the Pinkerton guards, and that evening (November 27, 1962) the guards were dismissed and the receiver, whose appointment was affirmed that day, took over the Manz property. Other agreements were also reached and all the agreements were to be embodied in a petition to be presented to the court for ratification and approval. The receiver commenced operation of the business of. Manz on the following day, November 28, 1962.

On December 6, 1962, a petition of the receiver was presented to the court for approval. It provided, among other things, for an order approving the financing agreement between Armstrong and the receiver which enabled the receiver to resume operation of the business of Manz. It also provided that in the event of adjudication the receiver would be required to return the physical possession of Manz' property to Armstrong. Provision for such return was likewise incorporated in a suggested order. On December 6, 1962, upon presentation of the petition (which contained a paragraph making all of the agreements described therein subject to ratification by the court), the court rejected approval of the petition and order, objecting to the provisions for delivery of possession of the property of Manz to Armstrong on the occurrence of certain conditions described in the petition and order. The referee pointed out that he was not bound by any agreement of the parties on this subject. At that time the court offered immediately to hear the parties on any claim of adverse possession by Armstrong. Armstrong declined this offer.

On the afternoon of December 6, 1962 a conference was held between counsel for the receiver, counsel for Armstrong and the referee. This conference was initiated by Armstrong. A new order was drafted based upon the petition previously presented and the agreement reached at the meeting with the referee. This new order was presented to the court on the following day, December 7, 1962. The new order after further amendment, and by agreement with Armstrong's counsel, was signed by the referee. The new order provided that the rights of Armstrong be determined as of the time of the filing of the petition in bankruptcy. The order further eliminated the provision for the receiver to deliver any of the property of Manz to Armstrong.

The receiver continued to operate the business of Manz after November 28, 1962 on the basis of the financing agreement with Armstrong. Manz after filing a petition for the arrangement under Chapter XI and obtaining approval of the petition by the referee, was then unable to effect an arrangement with creditors. A petition for arrangement filed on November 26, 1962 was dismissed on January 31, 1963 and an order of adjudication was entered on that date. On the same

day, Armstrong's counsel wrote a letter to the receiver demanding possession of the premises and property of Manz in behalf of Armstrong (on the basis of the petition of December 6), and this demand was refused by the receiver who continued to operate the business until February 15, 1963 with financing continued to be furnished by Armstrong. On that date, Francis J. Curtis was appointed trustee. On February 18, 1963 Armstrong in a letter to the trustee agreed to his continued operation of the business and it continued until February 19, 1963 to furnish the finances for the operation of the business of Manz by the trustee.

In the course of this proceeding seventeen reclamation petitions were filed. The reclamation petitions seek recovery of property sold by the petitioners to Manz under conditional sale (or title retention agreements) or leased to Manz.

In addition, some $1,100,000 in claims have been filed by general creditors; the Director of Internal Revenue has filed a claim for some $107,000 for withholding taxes; and a number of claims have been filed by other governmental agencies for taxes due from the bankrupt. Some $50,000 in wage claims have also been filed. All of these claims were filed in accordance with the applicable provisions of the Bankruptcy Act.

Armstrong contests the summary jurisdiction of the court and contends that the Referee should have conducted a preliminary hearing on the issue of Armstrong's claim to adverse possession of the bankrupt's property, and that the Referee erred in conducting a hearing on the merits of the entire matter.

In this case the court is in possession of the property and the trustee is seeking to sell the property of the bankrupt. In response to the trustee's petition to sell, Armstrong asserted its claim to adverse possession and requested an order on the trustee to surrender possession of the property to it. This "motion", presented on behalf of Armstrong, recognized possession in the court and was in effect a reclamation petition.

The cases relied upon in support of the position taken by Armstrong are cases wherein the adverse claimant was in actual physical possession of the property involved and the receiver or trustee in bankruptcy was seeking a turnover order against said property. The decisions relied upon by the petitioner Armstrong to support this contention are not in point. See Continental Casualty Co. v. White, 4 Cir., 269 F.2d 213–216.

Whatever possession Armstrong may have had, by reason of procedures followed on November 21, 1962, was surrendered to the receiver in this case upon his appointment when he went into physical possession of the property. Armstrong attempted to attach to this surrender of possession certain conditions by agreement with the receiver. This agreement was rejected by the court when the matter was presented on December 6, 1962 at which time Armstrong could have elected to take the position that it subsequently attempted to take, but these matters were resolved by the order entered, with the agreement of Armstrong, on December 7, 1962 which contained no provision for return of possession of the property to Armstrong. On the contrary, it is manifest from the changes made in the order of December 7, that the Referee clearly intended to reject any agreement which would provide for Armstrong to be restored to possession or to be considered to remain in possession. It is also implicit in that order that the Referee intended that the court retain possession of the property and with it the right to adjudicate the validity of Armstrong's claim to a lien. Armstrong attempted by agreement with the receiver to determine the question of its right to possession of the property. This matter was rejected by the Referee who offered then and there to try the issue of possession, which Armstrong declined to do.

The contention that by reason of the petition presented on December 6, and the order thereafter entered on December 7, taking into consideration the facts and circumstances surrounding the entry of that order, that Armstrong is

now entitled to be put in possession of the property, or to be considered to be in possession of the property, must be rejected. The Referee had summary jurisdiction in this matter and properly heard the entire matter on the merits. Teasdale v. Robinson, 290 F.2d 108, (8th Cir., 1961). If, thereafter, Armstrong's objection to the summary jurisdiction of the court was well taken, Armstrong could have participated fully on the merits without any waiver of its objection to jurisdiction, as its able counsel must have realized. Cline v. Kaplan, 323 U.S. 97, 65 S.Ct. 155, 89 L.Ed. 97; Teasdale v. Robinson, supra. Prior to the time of its agreement with the receiver, Armstrong had participated in an administrative phase of the bankruptcy proceeding and had thereby consented to the summary jurisdiction of this court.

At a hearing before me on review of the Referee's order appointing a receiver, counsel for Armstrong, Harry Margolis, appeared on behalf of Armstrong and argued at length opposing the appointment of a receiver and in favor of keeping the debtor in possession. Although Mr. Margolis referred to his appearance before me as special, this label seems meaningless under the circumstances. A party cannot ask the court to do something on its behalf and thereby invoke the jurisdiction of the court, as Armstrong did, on a special appearance. The only relief that can be asked by a party on a special appearance is that he be dismissed from court.

On this occasion Harry Margolis, attorney for Armstrong, made the statement (Tr. Ex. 108) that Armstrong did not foreclose its mortgage but took possession to protect creditors. The Referee correctly held that Armstrong could not lawfully take possession of the property involved here without first giving Manz fifteen (15) days notice, as provided in the loan agreement of December 14, 1961 and the letter of the same date from Armstrong to Manz to the same effect. (Tr. Ex. 45). In the absence of such notice, Armstrong's possession was unlawful and its claim to be in adverse possession is de-

void of any legal merit. In re Kolar, 296 F.2d 717 (7th Cir. 1961).

Armstrong's claim to possession of all of the assets of Manz, personal and real, finds no support in the record. The Referee correctly ruled that by reason of the explicit exclusion of the inventory, work in process and raw materials from Armstrong's chattel mortgage, rendered any claim to possession of that property without any color of right. The same is true as to the real estate, there being no provision in the trust deed for Armstrong to take possession in case of default. Furthermore, the Illinois Statute requires a court order for a mortgagee to be put into possession. Ill.Rev. Stat. Ch. 95, Sec. 23. Armstrong, likewise, had no basis to claim the substantial amount of third party property which is the subject matter of seventeen reclamation petitions filed in this proceeding. All of the foregoing property was clearly outside the scope of the Armstrong claim and vested the court with summary jurisdiction through the entire controversy. Once bankruptcy proceedings are filed, the jurisdiction of the bankruptcy court is paramount. Straton v. New, 283 U.S. 318, 51 S.Ct. 465, 75 L.Ed. 1060 (1931); Emil v. Hanley, 130 F.2d 369, 2d Cir. 1942; In re Lustron Corp., 184 F.2d 789, (7th Cir. 1950).

Armstrong relies on the case In re Display Stage Lighting Company, Inc., D.C., 56 F.2d 1046, in support of its contention that the Referee was required to honor the agreement made by the receiver with it relative to the return of possession of property. In the Display case a sheriff's sale was held at which one Greenfield was the purchaser. After the sale the original owner (judgment debtor) filed a bankruptcy petition and a receiver was appointed. The bankruptcy receiver took possession from Greenfield subject to an agreement between them that Greenfield's claim to adverse possession would be recognized by the bankruptcy court. At a subsequent hearing the court did honor its receiver's agreement for recognition of Greenfield's claim to adverse possession. But this

case is not applicable to the facts in the instant case. In the Display case there was a completed levy and sale with title passing to the purchaser, Greenfield. In the instant case there was no sale nor was there a foreclosure proceeding, but title remained in the bankrupt and possession to the extent that it was taken by Armstrong was unlawful. It is apparent that the Display case, supra, is inapposite and does not support Armstrong's position in this case.

The order of November 27, 1963 finds that the liens asserted on behalf of Armstrong under the trust deed and chattel mortgage of December 14, 1961 are null and void as fraudulent transfers under § 67, sub. d(2), sub-sections (b), (c), (d) and 70, sub. e of the Bankruptcy Act. The transactions that took place on that date between Armstrong and Manz are hereinabove set forth in detail in the Summary of Facts.

■ From the record, it is clear that approximately $1,500,000, proceeds of the loan transaction of December 14, 1961, were paid to George Schwartz as escrow agent for the selling shareholders of the Manz stock, which stock was acquired by Armstrong as part of the loan transaction. The Referee's findings in relation to this transaction are fully supported in the record and the facts clearly establish that there was a lack of fair consideration for the transfers in question.

■ In addition to proof of a lack of fair consideration to render a transaction voidable under § 67, sub. d(2) (b), (c), there must be proof, as to (b)—of the debtor being left with unreasonably small capital for the continuance of its business; and as to (c)—a belief by the debtor that it would incur debts beyond its ability to pay as they matured.

■ With respect to this requirement of (b), the record clearly establishes that Manz was left with an unreasonably small amount of capital for the continuation of its business. The proof of Manz' inability to pay its debts as they matured is in the testimony of Laden, Fund, Lattanzio, Margolies, Goble and in Trustee's

Exhibit 78 (showing an increase of debt from some $550,000 in December, 1961 to over $1,100,000 in November, 1962) and is in the evidence of overdrafts on the bank (Tr. Exhibit 70). Directly in point is In re Atlas Foundry Co., D.C., 155 F. Supp. 615 (D.N.J.1957) at page 618.

That the loan transaction of December 14, 1961 violates § 67, sub. d(2) (b), is clearly and conclusively demonstrated by this record.

■ With respect to § 67, sub. d(2) (c), the same evidence supports the Referee's conclusion that the bankrupt believed that it would incur debts beyond its ability to pay as they matured. It also is clear that Armstrong knew, or should have known, that the debtor would incur debts beyond its ability to pay. Armstrong's examiners had full access to the financial records of Manz and it is chargeable with knowledge of the contents of the Manz records. Depriving a financially hard pressed debtor of $2,000,000 of working capital could have no other result than to create a belief that the debtor would incur debts beyond its ability to pay as they matured. It would require no guess work on the part of a trier of facts to find such a belief on the basis of this record. See 4 Collier, Bankruptcy 67.36; Kindom Uranium Corp. v. Vance, 269 F.2d 104, (10 Cir. 1959). In any event the existence of such an intent is a question of fact, Hartnett v. Doyle, 16 Tenn.App. 302, 64 S.W.2d 227 (1932) (Applying UFCA), and there is no basis to disturb such finding by the Referee.

■ The Referee also invalidated the transfer to Armstrong under subdivision 67, sub. d(2) (d) which voids transfers made by a debtor with an actual intent to hinder, delay or defraud creditors. In dealing with the actual intent required by this subdivision (d), intent to hinder or delay is condemned equally with an intent to defraud. 4 Collier on Bankruptcy, 67.-37 (14 Ed. 1962).

■ The issue of actual fraudulent intent is one of fact. Richardson v. Germania Bank of City of New York, 263 F. 320, (2nd Cir. 1919). The find-

ing of a referee who has heard oral testimony on this issue is entitled to great weight on appeal in view of the peculiar importance in a § 67, sub. d(2) (d) case of the credibility of witnesses examined on the intent issue.

In re Gallis, 115 F.2d 626 (7th Cir. 1940). Cert. denied 312 U.S. 704, 61 S.Ct. 808, 85 L.Ed. 1137, 1941.

The finding of the requisite intent may be predicated upon the concurrence of facts which, while not direct evidence of actual intent, lead to the irresistible conclusion that the transferor's conduct was motivated by such intent. McWilliams v. Edmonson, 162 F.2d 454 (5th Cir. 1957). Courts have repeatedly observed that each case under § 67, sub. d (2) (d) must depend upon its own facts. 4 Collier 67.37, pp. 374–381.

In re Chorost v. Grand Rapids Factory Show Room, Inc., 172 F.2d 327 (3rd Cir. 1949), the court held in construing subdivision (d) that the finding of the requisite intent could be predicated upon the concurrence of facts which, while not direct evidence of actual intent, would lead to the irresistible conclusion that the transferor's conduct was motivated by such intent.

In the case of In re Venie, D.C., 80 F. Supp. 250 (W.D.Mo.1948), the court held that where the transferee and owner of the transferor had knowledge that the transfer would deplete the debtor's assets and deprive creditors of their right to be paid out of the firm's property in a transaction in which the consideration would not run to the benefit of the debtor, the transaction was fraudulent, and the chattel mortgage which was part of the transaction was void. In this Circuit our Court of Appeals in Edward Hines Western Pine Co. v. First National Bank, 61 F.2d 503 (1932), held transfers by the owners of a bankrupt which benefited the owners personally and not the bankrupt corporation was a transfer to hinder, delay or defraud creditors. Also see Lytle v. Andrews, 34 F.2d 252 (8th Cir. 1929). M. V. Moore & Co. v. Gilmore, 216 F. 99 (4th Cir. 1914) for cases involving purchase of shares by corporation which were held to be fraudulent.

The foregoing authorities fully support the Referee's finding that the transfers were fraudulent under § 67, sub. d(2) (d). The consequences or result of the withdrawal of $2,000,000 in working capital from the debtor and the placing of its prior lien for $2,500,000 against all the assets of Manz could only result in hindering and delaying creditors in the obtaining of payment of their claims or result in their being unpaid and the creditors defrauded. Armstrong's intention to cause just such a result is fully supported by the record. It is elementary that a party is held to intend the natural consequences of his acts. Armstrong's arranging for and causing the unwarranted withdrawal of $2,000,000 in working capital from Manz at a time when Manz was having difficulty paying its debts clearly and conclusively justifies the Referee's conclusion that the transaction of December 14, 1961 is voidable under § 67, sub. d(2) (d) of the Bankruptcy Act. Additional support for this conclusion rests on the evasive testimony of Armstrong's witnesses covering the transaction, Autrey Bros. Inc. v. Chichester, 240 F.2d 498 (9th Cir. 1957); the manner in which the proceeds of the loan were paid to a third party (Schwartz, attorney for the debtor) rather than directly to the shareholders, which would have made tracing the proceeds of the loan much easier; Armstrong's vacillating between the position of shareholder and that of a secured creditor depending upon the circumstances; the hinderance and delay to creditors, is conclusive in Trustee's Exhibit 78.

On the basis of this record, I hold that the Referee could make no finding other than the transfer of December 14, 1961 is void under § 67, sub. d(2) (b), (c), (d), of the Bankruptcy Act.

That Armstrong is not entitled to the saving provision of § 67, sub. d(6) in favor of a bona fide lienor as to that portion of the proceeds of the loan that actually benefited Manz, is manifest from

the Referee's finding of actual fraudulent intent on its part in the transaction under § 67, sub. d(2) (d). Armstrong cannot possibly claim that it acted in "good faith" as a bona fide lienor without fraudulent intent. 4 Collier 67.41, pp. 421–428. Brief pp. 107–108. See In re B-F Building Corporation, 312 F.2d 691 (6th Cir. 1963). In re Venie, D.C., 80 F.Supp. 250 (W.D.Mo.1948).

The Referee also found the transaction in question violated § 70, sub. e of the Bankruptcy Act, which incorporates State law as grounds for invalidation. Armstrong has shown no error in the Referee's rulings that the transfers to it are voidable under the Illinois Statute relating to fraudulent conveyances. Ill. Rev.Stat. Ch. 59, § 4; Woodham v. Miller, 319 Ill.App. 388, 49 N.E.2d 317; Phillips v. Kesterson, 154 Ill. 572, 39 N.E. 599; Sherwin-Williams Co. v. Watson Indus., 361 Ill. 598, 198 N.E. 704, are cases in point supporting the Referee's ruling as to the transfers to Armstrong constituting fraudulent conveyances under Illinois law.

Nor has Armstrong shown that there is any error in the Referee's conclusion that the transfers are voidable as part of a conspiracy to cause an illegal redemption of the shares of stock of Manz at a time when Manz was unable to pay its debts as they matured in violation of § 6 and § 58 of the Illinois Business Corporation Act. Ill.Rev.Stat. Ch. 32, §§ 157.6, 157.58. In re Kranz Candy Co., 214 F.2d 588, (7th Cir. 1954), is directly in point. Also see Maggiore v. Bradford, 310 F.2d 519 (6th Cir. 1962).

In addition to invalidating the liens held by Armstrong against the Manz properties arising out of the loan agreement of December 14, 1961 as being contrary to the provisions of 67 and 70 of the Bankruptcy Act, the Referee subordinated the entire claim of Armstrong including the claims based upon advances made to Manz secured by assignments of accounts receivable, as well as the chattel mortgage loans of May 24 and June 10, 1962.

The subordination was based upon the Referee's finding that the bankrupt Manz was the alter ego of Armstrong; that Armstrong was not a secured creditor but in substance the owner of Manz through its holding of over 90% of its stock and its control over all of its income. Further grounds for the subordination, in the Referee's order, are predicated upon the unfair, inequitable, unconscionable and fraudulent conduct of Armstrong in its transaction with Manz to the detriment and damage of its creditors.

Armstrong in its briefs claims the Referee erred in his order of subordination; that it was a mere lender or mortgagee holding Manz' shares of stock as collateral security; that it made a loan of $2,500,-000 to Manz and Manz distributed the proceeds; and further that it had nothing to do with the redemption and that it did not deprive Manz of any working capital; and that the transaction was at "arms length". Armstrong contends there is no evidence of domination, control, breach of fiduciary duty or faithless stewardship as required by the cases it cites for subordination. An examination of the cases cited by Armstrong in its brief discloses that they are not applicable to the facts in this record.

The Referee found, as stated above, that the transaction of December 14, 1961 was made with intent to hinder, delay and defraud creditors; that Armstrong participated and directed the illegal redemption of stock which deprived Manz of $2,000,000 of working capital; and that the conduct and actions of Armstrong toward Manz and its creditors were unfair, inequitable and unconscionable.

Armstrong does not show that any such findings of the Referee are in any way erroneous. On the contrary, the record fully supports these findings of the Referee. That such findings fully support the order of subordination is clear from the applicable authorities. 3 Collier on Bankruptcy, 14 Ed. 57.14, 63.-06, 63.08, 65.06 and cases cited. Bell Tone Records, Inc., D.C., 86 F.Supp. 806 (D.N.J.1949). International Tel. & Tel. Corp. v. Holton, 247 F.2d 178 (4th Cir.

1947). Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281. Central States Corp. v. Luther, 215 F.2d 38, 46, (10th Cir. 1954). Costello v. Fazio, 256 F.2d 903, (9th Cir. 1958). In the latter case the court held that a finding of fraud was not essential to an order of subordination. Cases in point are collected in an article by Harry S. Gleick in the 33rd Edition of the Journal of the National Association of Referees in Bankruptcy, page 69 (1959), wherein the author sets forth grounds or basis for subordination applied by the courts, most of which were present in this record.

The evidence of Armstrong's control, domination, spoliation, ownership and breach of fiduciary duty is clearly established by the record and fully justifies the Referee's order of subordination of Armstrong's entire claim.

General Order 47 of the General Orders in Bankruptcy is in part as follows:

"Unless otherwise directed in the order of reference the report of a referee or of a special master shall set forth his findings of fact and conclusions of law, and the judge shall accept his findings of fact *unless clearly erroneous.*" (Emphasis added).

Rule 52(a) of the Federal Rules of Civil Procedure is to the same effect.

Considering the numerous assignments of alleged error by Armstrong in its 137 page petition for review, in the light of my duty to accept the Referee's findings unless *clearly erroneous,* it is clear to me that most of the assignments are without merit and that it would unduly further prolong this already too lengthy opinion to answer each and every assignment. However, grouping the assignments into five principal categories, the first and principal group of objections of Armstrong is that the evidence offered was immaterial upon the only issue in the proceeding, namely, that of summary jurisdiction. This objection is a re-argument of the issue of summary jurisdiction which has been clearly answered above. The Referee correctly ruled that the bankruptcy court had summary jurisdiction so that the evidence offered was material and competent to the issues presented by the pleadings.

A second group of objections is that on the competent material evidence the Referee should have made different and contrary findings of fact. For example, Armstrong asserts, at page 46 of its Brief, that the Referee should have found Harry Margolis was not the attorney for Armstrong, implying that Armstrong was not bound by his statements to the court in his objections to the appointment of a receiver and his statement as to Armstrong's possession being for the protection of the creditors. Armstrong's witness Rubin so testified. However, on the record disclosing Margolis' responding to an invitation to speak in open court in behalf of Armstrong in the presence of, and without objection from the witness Rubin, and considering Margolis' participation in negotiations with creditors as a representative of Armstrong (with Rubin, Armstrong's attorney), the Referee was clearly correct in his finding.

The Referee's finding of Manz' inability to pay its debts as they matured in the regular course of business is another example of finding assigned as erroneous by Armstrong. The finding is conclusively established by the testimony of Lattanzio, Laden, Margolies, Fund, Goble and Trustee's Exhibit 78. Other conflicts in the testimony were correctly resolved by the Referee in accordance with his function as trier of the facts. In re Gordon & Gelberg, 69 F.2d 81, 83 (2nd Cir. 1934). In re New Style Hat. Mfg. Co., D.C., 43 F.Supp. 122 (N.D. Ohio, 1940). Indeed, Armstrong in its objections relies upon testimony of its witnesses which was rejected by the Referee and which cannot be considered as a basis for setting aside a finding as clearly erroneous. United States f. u. o. Browne & Bryan Lumber Co. v. Massachusetts Bonding & Ins. Co., 303 F.2d 823, 827 (2d Cir.) 1962.

Another or third group of assignments of error is that the Referee failed to make findings which he should have made. In

none of these alleged errors does Armstrong cite record references or exhibit references which would support such proposed findings so that I am without information as to the basis for such suggested findings. See Dearborn National Cas. Co. v. Consumer's Petroleum Co., 164 F.2d 332, 333 (7th Cir. 1947). It appears to me that either there is no evidence to support the numerous suggested findings or in other instances that the findings would have to rest upon rejected testimony.

A fourth group of objections is that the Referee should have drawn different inferences from evidence which Armstrong does not contradict. Inferences to be drawn from the evidence is clearly a function of the Referee. In re Gordon & Gelberg, 2 Cir., 69 F.2d 81, 83. An example is the objection, at page 46 of Armstrong's Brief, that the Referee erred in failing to find that when Margolis testified Armstrong took possession to protect creditors that any equity remaining would be available for creditors. The Referee correctly inferred from this statement, in the absence of any claim to adverse possession, that Margolis meant what he said, namely, that Armstrong took possession to protect creditors and not as an adverse claimant or to foreclose its mortgage.

A fifth and final group of objections consist of miscellaneous alleged assignments of error which are without any basis whatsoever. For example, repeatedly Armstrong complains that the Trustee failed to offer in evidence certain exhibits. The record discloses Armstrong produced these documents in response to a subpoena of the Trustee, that they were marked for identification but were not offered in evidence. Armstrong did not offer these or require ruling from the Referee requiring the Trustee to offer them. Accordingly, there is no basis for complaint nor does Armstrong cite authority in support of its position.

Considering the entire Petition for Review and each of the numerous assignments of error contained therein in the light of General Order 47, it is my considered judgment that Armstrong has failed to show where the Referee has committed any error. The record instead fully and clearly supports the findings of fact, the conclusions of law, and the orders entered by the Referee and sought to be reversed by Armstrong's Petition for Review. Accordingly, I hereby adopt and affirm said findings of fact, conclusions of law and orders and deny the prayer of the said Petition for Review. The orders of November 27, 1963 and December 2, 1963 are hereby affirmed.