AMERICAN MANNEX CORPORATION, Appellant,

v.

Joe D. HUFFSTUTLER, Trustee for Trice Production Company, Bankrupt, Appellee.

No. 20786.

United States Court of Appeals Fifth Circuit.

March 26, 1964.

Newton M. Crain, Jr., Blades, Crain, Slator & Winters, Houston, Tex., for appellant.

F. Lee Lawrence, Tyler, Tex., Lawrence & Lawrence, Tyler, Tex., of counsel, for appellee.

Before HUTCHESON and BROWN, Circuit Judges, and CHRISTENBERRY, District Judge.

JOHN R. BROWN, Circuit Judge:

This case raises the frequent, much litigated and occasionally difficult question of when a summary proceeding by the Bankruptcy Court is proper in seeking the return of property to the bankrupt estate. The District Court held, in effect, that a plenary action was not necessary because on the facts revealed in the hearing the respondent-appellant did not have more than a colorable claim to the property. Consequently, the District Judge ordered the turnover of the disputed property and the proceeds representing portions thereof which had been sold. Although we take a somewhat different route, we agree with this result and affirm.

There is one unusual twist in the way this old problem arises. This particular bankruptcy case, apparently involving claims running into the millions with many complications growing out of extensive operations of an oil and gas production enterprise, was never referred to a Referee. The District Judge retained complete and immediate control over it. The result is that if the appellant's attack is sustained, this very same Judge in the very same courtroom must, so far as this record indicates, again hear the very same testimony from the very same witnesses to decide the very same substantive issue already determined.[1] Of course we must resist the temptation to take shortcuts if, under controlling principles, a plenary hearing was required and none was afforded. But this does suggest that in borderline situations, the District Court by the exercise of resourceful ingenuity, with no sacrifice of any rights and with all of the substantive protections of a plenary suit, may devise a procedural arrangement by which the same evidence on the same question is heard but once, with the Court (or in the event of an appeal, the Appellate Court) thereby reserving the power to enter the appropriate order depending on whether it is, or is not, one for summary or plenary procedure.[2] Although we cannot escape the feeling that had this course been pursued, the parties would have willingly accepted the hearing before the Judge, this was not done, and we must therefore determine whether a plenary suit was required and, if so, whether in effect it was afforded.

1. Collier suggests authoritatively that under certain circumstances this is not required.

"[W]here a defendant insists that he was entitled to a plenary mode of procedure not accorded him, and the appellate court finds that the proceedings, though called 'summary' and commenced as such, actually had all or most of the requisites of an ordinary civil action and afforded the defendant a full hearing on the merits, the court will consider the proceeding as a plenary suit."

2. Collier, Bankruptcy, § 23.02, at 442 (14th ed. 1962).

2. Even the claim of a right to jury trial, put forward here for the first time on the appeal, would present no real obstacle. The District Judge, whether in his role as "Bankruptcy" Judge or "Civil Action" Judge has wide discretion both in the entry of interim protective orders to preserve property, prevent transfers, etc. and likewise in handling of the docket, advancement of the case for trial, and the like.

This is not the case of property physically within the possession of the Bankrupt, Trice, on the date of bankruptcy, October 12, 1962. We accept the proposition that it was under the dominion and control of respondent Mannex [3] and had been since September 25 when the actions, here under review, occurred. Far from recognizing this physical fact as any obstacle, the Trustee-appellee contends that the pipe was in the "constructive" possession of Trice, and this is enough both as to the form of the proceeding and the substantive rights. We recognize, of course, that there is a vast amount of case law which speaks in these terms. But it seems to us that the matter is greatly simplified by approaching it for what it really is—the question whether the party has a *legal right* to maintain the actual, physical possession.[4]

In combating the summary jurisdiction and a turnover order, it was the theory of Mannex that its "adverse" claim was substantial, not merely colorable, for either one or both of two reasons. The first one was that the debtor, Trice, prior to bankruptcy, had voluntarily agreed to repossession of the pipe. The second was that this taking of repossession by Mannex merely effectuated its rightful determination to rescind the original sale because of fraud. It was fraud in law, the argument continues, because Trice failed to comply with the conditions for delivery of additional pipe, and in any event Trice had neither the expectation of, nor the financial capacity for, payment. Consequently, under Texas law the vendor had the right to rescind and this was what was done.

Mannex had sold a considerable amount of pipe to Trice over a period of years. At some time a revolving credit of $1,250,000 had been established. From time to time Trice would execute new installment notes in payment for pipe purchased under this credit arrangement. In the spring of 1962, when the amount due and unpaid on these unsecured installment notes totaled approximately a million dollars, Mannex cut off Trice's credit. About this time, to the knowledge of Mannex and some other creditors, Trice was negotiating for a substantial bank loan on the West Coast. Trice, through its president, and Man-

---

3. American Mannex Corporation.

4. This cuts both ways and applies to the Trustee as well. "Possession, therefore, is the fundamental, but not the only, test; possession in the bankruptcy court must, of course, be rightful. If it can be shown that property held by the court or its officers has not been rightfully taken, the court will order its surrender. Where the actual or constructive possession is found to be in a third person, then the question becomes one of the substantiality of the claim under which possession is held, and that possession will be unavailing where the claim asserted is merely colorable." 2 Collier, Bankruptcy, § 23.05 [1], at 467–69 (14th ed. 1962) [hereinafter cited Collier]. See May v. Henderson, 1925, 268 U.S. 111, 119, 45 S.Ct. 456, 69 L.Ed. 870; Chandler v. Perry, 5 Cir., 1934, 74 F.2d 371, at 373. Constructive possession is said to occur where, among other things the property "(5) is held by one who makes a claim which is not substantial and is colorable only." 2 Collier § 23.05 [3], at 483. The semantic difficulty is enhanced because the jurisprudence infuses into "adverse claimants" a term-of-art connotation. See 2 Collier, §§ 23.04, 23.05. Thus the simple statement having comfortable reassuring finality, that "there is hardly any question of law better settled than that * * * a court of bankruptcy has no jurisdiction, * * * to hear * * * in a summary proceeding a controversey as to * * * claims upon property held adversely * * * where such property came into the claimant's possession prior to bankruptcy," 2 Collier § 23.06, at 491, almost immediately becomes a statement of the problem, not its resolution. "The question, therefore, of who are 'adverse claimants' becomes one of primary importance where the property is in the possession of the party other than the bankrupt." Id. § 23.06, at 494. The reasoning then comes full circle because, " * * * * mere possession without any valid claim of title or interest is insufficient * * *. Nor is possession sufficient where the property is held by one who makes a claim that is only colorable * * *." Id. § 23.06 [1], at 496–97. Possession, actual or constructive, is therefore inconsequential. The important thing is the lawful, rightful character of that "possession."

nex, through its president Wagner, negotiated concerning deliveries of additional pipe. On May 16, 1962, Trice and Mannex consummated a memorandum agreement in which Mannex reinstated the revolving credit up to $1,250,000. At the time this agreement was made, Trice owed a part of its March installment and all of its April installment. Under the agreement, Trice was to have the open line credit upon the payment of the May note and payment of approximately $90,000 on the past-due installments.

These payments were never made. Nevertheless, Trice purchased and Mannex through its Houston agent at Mercer's Truck Yard in Houston delivered pipe of an invoice value of $100,965.17. Though Wagner, President of Mannex, testified that no one had ever ascertained who in Mannex authorized this delivery, it was an acknowledged fact that it took place. More than that, Mannex's own case reflected that on May 31, 1962, Mannex formally billed Trice for this precise pipe by Invoice No. H–03446. This May 18 pipe [5] was commingled with pipe previously purchased from Mannex and stored for Trice's account in the Mercer Yard. Trice withdrew pipe as needed without regard to time of purchase and of the May 18 pipe only $54,006.94 worth remained at the time of repossession, September 25. In the meantime, Mannex knew firsthand that Trice had not kept its bargain of May 16. Intensive negotiations went on in late June resulting in renewed remonstrances from

Mannex to Trice for the payment of its ever-increasing indebtedness, and a formal agreement on the part of Trice to execute mortgages on certain oil production properties,[6] plus a number of other specific things. The mortgages were delivered, but no payment ever made.

It is fair to say that things went from bad to worse. Trice apparently couldn't meet its August payroll and while it is not of any peculiar significance, it seems fair inference that the thing which triggered action by Mannex in late September was the word it got through the trade that a so-called "finance committee" had been set up by Trice made up of leading creditors but not including Mannex. In any event, in September the local representative of Mannex contacted the treasurer of Trice requesting permission to repossess the pipe at the Mercer Yard as payment on the Trice indebtedness. It is uncontradicted that the treasurer declined to give such permission and stated that he had no authority to do so. Nevertheless, on September 25, 1962, without the consent of Trice or anyone of authority acting for it, Mannex took possession of pipe valued at $106,725.41. It warrants emphasis that this amount bore no relation to the May 18 delivery. This was moved from the Trice racks to the Mannex racks in the Mercer Yard. Pursuant to instructions from Mannex, Mercer's records were changed to show the pipe being held for account of Mannex. By letter of

---

5. For convenience we refer to it in this fashion.

6. The memorandum agreement of June 24, 1962, leading to the mortgages provided:
"(1) By July 3, 1962, American Mannex Corporation is to receive payment from Trice * * * of all interest charges due and accrued by June 30, 1962 (about $30,000.00).
"(2) Trice * * * agrees to furnish * * * within ten days when a payment under the * * * open credit arrangement becomes delinquent negotiable * * * Deeds of Trust and * * * mortgages.

"(3) * * * Mannex * * * is to receive not later than Friday, June 29, * * * Deeds of Trust * * * in the total amount of $210,000.00.
"* * * *"
In subparagraph (4), (5) and (6) specific provisions was made for the share Mannex would receive out of pending bank refinancing and equity sales programs. In par. (7) Trice was expected "to be current with the payments to American Mannex by the end of August 1962" and promised thereafter to remain current. Under par. (8) Mannex agreed that on the payment of interest by July 3 and delivery of mortgages Trice would be entitled to an additional $100,000 of pipe under the open credit arrangement.

September 25, 1962, Burk of Mannex transmitted six invoice credit memoranda dated September 24 identified separately as to prior invoices and date of purchases for amounts totaling $106,725.41.[7] This letter is described in the brief of Mannex as advice that "Mannex had elected to rescind the contract and repossess the pipe." But the letter, written to the attention of Barnett, treasurer of Trice, made no such claim.[8] Although not shown to have been authorized, an employee of Trice issued a tabulated form "material transfer" dated September 24 showing transfer of this pipe from "Mercer Yard" to "American Mannex Corporation" to be used for "credit." It was uncontradicted that the Treasurer Barnett did not know of these material transfers until months later, and he never approved or ratified them.

As we read the District Judge's memorandum opinion, he held, first, that there was no evidence that at the time it entered into the May 16 agreement and purchased the May 18 pipe, Trice had no intention of paying for it. Likewise, he held that the evidence did not support the claim that Trice had no reasonable expectation of being able to pay for the May 18 pipe. The Court then reached several conclusions. The first was that the pipe was "in the constructive possession of Trice" at the time of bankruptcy because title passed to Trice from Mannex with Mannex accepting Trice's promissory notes for payment secured later on by the June mortgage. Next, the rescission, if one was attempted, was "void under the undisputed facts" especially as to pipe other than the May 18 pipe. Finally, Mannex having no "lawful right to repossess the pipe," was guilty of a conversion, so its actual physical possession "did not give it legal possession of the pipe." Summarizing it all in the traditional language, the Court held that the claim of Mannex "to the pipe is not substantial but is merely colorable and without merit."

■ Although there might be some difficulty in sustaining summary jurisdiction were we limited to approving what appears to be findings on the intrinsic merits (or rather lack of merits) in the assertion of Mannex, the record does not compress this case into that mold. On the contrary, we think it plain that Mannex did not carry its minimal burden in showing that its claim was not merely colorable.

■■ Of course the mere assertion of a claim by an outsider, such as Mannex, does not stop the bankruptcy proceeding in its tracks. A preliminary inquiry is necessary and appropriate to ascertain whether the case is one for a summary proceeding or a plenary suit. 2 Collier § 23.07. We long ago recognized the necessity that there be a " * * preliminary jurisdiction to inquire into the nature of the defendant's possession and into any adverse claim so far as to see whether it is more than colorable."

---

7. The breakdown is as follows:

Date of Invoice/Shipment

| Against Which Credited | Total Amount |
| --- | --- |
| August 30, 1961 | $ 20,248.74 |
| August 4, 1961 | 615.99 |
| April 25, 1962 | 1,537.61 |
| May 31, 1962 | 54,006.94 |
| March 14, 1962 | 26,157.08 |
| August 30, 1961 | 4,159.05 |
| Total | $106,725.41 |

---

8. After referring to the credit memoranda, the Burk letter stated:
"These credit memorandums are issued in accordance with our verbal agreement on September 12, 1962, in American Mannex's office, Houston, Texas. The amount of these credit memorandums will be applied against your delinquent note payments. We are taking immediate possession of these tubular goods."

Chandler v. Perry, 5 Cir., 1934, 74 F.2d 371, at 372; see also Spach v. Fisher, 5 Cir., 1962, 310 F.2d 328, 330; Beneficial Finance Co. v. Ray, 5 Cir., 1964, 328 F.2d 55. Since the mere assertion of a claim by an outsider is not sufficient to oust summary jurisdiction, it follows that the claimant must go further. Of course he need not prove the basis for his claim to the point where he obtains a favorable adjudication of it. But he certainly must go far enough to show, first, that there is an arguable factual basis for the claim, and, second, that on such factual basis there is some plausible ground for thinking that the law will afford redress. See Spach v. Johnania, Inc., 5 Cir., 1961, 291 F.2d 619, 620; Nicholas v. Peter Pan Snack Shop, 5 Cir., 1958, 256 F.2d 349, 354; Spach v. Fisher, 5 Cir., 1962, 310 F.2d 328, 330–31.

■ Approached in this light, Mannex failed completely as to the underlying contention that repossession by the vendor was with the express consent of the debtor, Trice. The proof showed Mannex sought this very thing. But it is uncontradicted that the treasurer of Trice, the only one ever consulted, categorically declined to give such assent. Whether, as Mannex urges, he agreed to discuss it with his principals, his own testimony remains uncontradicted that no consent was thereafter given. All that remains to offset this is the self-serving statement in Burk's letter of September 25, (see note 8, supra) that these "credit memorandums are issued in accordance with our verbal agreement on September 12, 1962, * * *." But Burk never testified nor was anyone called to support that statement.

Of course the necessity for a plenary suit could not be avoided by credibility choices where versions are different, or disparate inferences may be drawn. But here the story is plain and uncontradicted. The summary proceeding was proper, not because the trier affirmatively credited the treasurer, but because there was simply no basis shown for disregarding the treasurer's testimony. There was thus no minimal showing of any arguable, factual basis for this part of Mannex's claim.

Once the notion of express consent fails, absolutely nothing remains of that portion of the claim representing pre-May 18 pipe.[9] This was pipe long since purchased and paid for by promissory notes. No contention was made, and no proof offered, that at the times of these older shipments, see note 7, supra, there was any fraud. As to such pipe, Mannex could escape the inevitable legal characterization as a converter only by showing consent to the repossession. This Mannex wholly failed to do.

As to the remaining portion representing May 18 pipe, the proof likewise failed to show any substantial factual basis for the contention, as the appellant's brief puts it, that "Mannex had elected to rescind the contract and repossess the pipe * * *." In this conclusion, we make no credibility resolution. Indeed, we may indulge assumptions favorable to Mannex's theory. First, we may assume that Trice could not pay, and did not have any expectation of being able to pay, as contemplated by the agreement of May 16. Likewise, we may assume that under Texas law, this would entitle a vendor to rescission.[10] Next, we may also assume—contrary to the vigorous contention of the Trustee—that this right of rescission can be effectuated by a vendor

---

9.

| Item | Amount |
| --- | --- |
| Total pipe repossessed | $106,726.01 |
| May 18 pipe | 54,006.94 |
| Pre-May 18 pipe repossessed | $ 52,719.07 |

10. Mannex stresses these bankruptcy cases: In re Paper City Mill Supply Co., D.C. Mass., 1928, 28 F.2d 115; Collier, Bankruptcy Manual, § 70.26 (Laube ed. 1962);

In re Perelstine, W.D.Pa., 1927, 19 F. 2d 408; Johnson v. Robinson, 5 Cir., 1953, 203 F.2d 135; and these Texas cases on local substantive law: Slayden-Kirksey Woolen Mills v. Weber, 1907, 46 Tex.Civ.App. 433, 102 S.W.2d 471; Boerner v. Cicero-Smith Lbr. Co., Tex. Comm.App., 1927, 298 S.W. 545; Guinn v. Lokey, 1952, 151 Tex. 260, 249 S.W.2d 185; Harry Wagner Products' Co. v.

forceably taking the goods from the debtor without the consent of the debtor and without some character of judicial decree.

But despite these assumptions, there was simply no proof that this is what Mannex did or tried to do. Burk's letter shows that from the standpoint of Mannex, the repossession was being done by consent. The only person undertaking to testify was the president of Mannex, and he categorically admitted complete ignorance about the circumstances leading up to, or resulting in, the repossession of the pipe on September 25. In his testimony, he expressly ascribed this to decisions made by his superiors, none of whom had communicated with him about it.

On the theory of Mannex, the right to rescission depended on legal fraud arising either from a known intention on the part of the buyer not to pay, or the complete absence of any basis for the buyer's expectation of payment. If this really was the motivation for the repossession, then Mannex had the burden of at least showing the existence of a factual basis for such purpose. Conceding that it undertook to establish the buyer's inability to pay or lack of expectation of payment, no proof at all was made as to the reasons why the repossession was undertaken by Mannex. All of this is a lawyer's afterthought faced, as was counsel, with the necessity of offering some creditable explanation for what appears to have been an indiscriminate effort by Mannex to salvage whatever it could, in any way it could, and thereby prove the validity of the old saw that possession is 9 points of the law.[11]

Added to this is the further uncontradicted fact that by the subsequent memorandum agreement of June 24 and the execution of mortgages by Trice required thereunder, there was as complete a ratification of the sale of May 18 by Mannex as could ever be imagined. The obligation secured by the mortgage included the indebtedness for the May 18 pipe. And Mannex made no effort to prove any factual basis for events transpiring between that date and September 25 which would give rise to a Texas right to repossession. By this time Mannex had full knowledge that Trice had not kept the May 16 agreement, and that it had no cash with which to pay. Nevertheless, by a purposeful, deliberate act, Mannex sought and obtained additional security and the promise of further security out of the hopes—and the agreement shows they were nothing more—that from some banker or lender or investors Trice would somehow be able to make it after all. (See note 6, supra.) In the face of this uncontradicted conduct, Mannex made no effort to prove any facts by which to avoid the consequences of Texas law which holds that the right of rescission, if it ever existed, is waived by the retention of the benefits of partial performance or the acceptance of consideration, partial payment, or security.[12]

As to pre-May 18 pipe and May 18 pipe, the showing of Mannex never elevated the claim above a colorable one. Summary jurisdiction was proper and no contention is, or could be, made that the fact findings are clearly erroneous. That is enough.

Affirmed.

Adams, Tex.Civ.App., 1953, 258 S.W.2d 190; Miller v. Latham, Tex.Civ.App., 1954, 276 S.W.2d 858.

11. "On its own theory, rescission obviously was not the basis for repossession. In its theory Mannex did not undertake to distinguish between the components of the $106,725.41 worth of pipe retaken. Mannex claimed it all. Yet it is now uncontradicted that, at most, it never could claim more than $100,965.17, the invoice price of May 18 pipe, and even as to this only $54,006.94 was available for repossession.

12. See Rosenbaum v. Texas Bldg. & Mtg. Co., 1943, 140 Tex. 325, 167 S.W.2d 506; Dobbs v. Johnson, 1921, Tex.Civ.App., 230 S.W. 1035; Fisher v. Gulf Production Co., Tex.Civ.App., 1921, 231 S.W. 450, error ref'd; and see 10 Tex.Jur.2d, Cancellation of Instruments § 57 (1959).