In the Matter of PROCESS–MANZ PRESS, INC., Bankrupt.

A. J. ARMSTRONG CO., Inc., Appellant,

v.

Edward LIMPERIS, Successor Trustee, Miehle-Goss-Dexter, Incorporated, Harris-Intertype Corporation, Bulkley Dunton & Co., Division of Carter Rice Storrs & Bement, Inc., Berkshire Papers, Inc., Midland Paper Company and Reliable Paper Company, Appellees.

No. 15086.

United States Court of Appeals
Seventh Circuit.

July 29, 1966.

Rehearing Denied Oct. 3, 1966.
(En Banc)

Certiorari Denied March 13, 1967.

See 87 S.Ct. 1022.

Norman H. Nachman, Joseph Stein, Chicago, Ill., for appellant.

Joseph L. Kadison, William B. Davenport, Robert A. Downing, William S. Collen, Joseph J. Robinson, Jr., Collen & Kessler, Kamenear, Blumenthal, Kurlan & Kadison, Raymond, Mayer, Jenner & Block, Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel, for appellee, Miehle-Goss-Dexter, Inc.

Irving H. Goldberg, Edward P. Madigan, John Hudson, Chicago, Ill., Goldberg, Weigle, Mallin & Rivkin, Chicago, Ill., of counsel, for appellees Berkshire Papers, Inc., Midland Paper Co., and Reliable Paper Co.

Before SCHNACKENBERG, KILEY and SWYGERT, Circuit Judges.

KILEY, Circuit Judge.

A. J. Armstrong Company, Inc., appeals from a judgment of the district court affirming orders of a referee in the Process-Manz bankruptcy proceeding which rejected Armstrong's challenge of the referee's summary jurisdiction, invalidated as fraudulent conveyances certain security transactions between Armstrong and the bankrupt which secured a loan of $2,500,000.00, subordinated Armstrong's claims (asserted to exceed $3,-750,000.00) to those of all general creditors, and directed a sale [1] of the bankrupt's assets free from the liens of the asserted security transactions. In re Process-Manz Press, Inc., 236 F.Supp. 333 (N.D.Ill. 1964). We reverse.

Process-Manz, the bankrupt, was, on December 14, 1961, in the printing business in Chicago, Illinois. On October 4, 1961, Manz had borrowed from A. J. Armstrong; a New York financial institution, $1,000,000.00. On December 14, 1961, Manz borrowed from Armstrong an additional $2,500,000.00 and to secure the loan executed a trust deed of its Chicago real estate and a chattel mort-

---

[1]. This court on February 7, 1964, affirmed an order by the district court for a stay of the sale conditioned upon a surety bond of $3,000,000.00 and payment of auctioneer's expenses preparing for the sale. The conditions were fulfilled by Armstrong and the sale stayed. In the Matter of Process-Manz Press, Inc., Bankrupt—Armstrong, Inc. v. Curtis, No. 14506.

gage of its personal property, exclusive of inventory and work-in-progress.[2] On November 21, 1962, Armstrong, assertedly because of Manz's default in payments on the loan, took possession of the Manz real estate, machinery, equipment, and other personal property, changed the locks on doors, posted signs giving notice that it had taken possession and was holding the property exclusively in its name, and employed guards to police and patrol the premises. On Friday, November 23, 1962, an involuntary petition in bankruptcy was filed against Manz. On November 26 a receiver was appointed, and on review the district court approved the appointment.

Thereafter, on November 27, Armstrong and the receiver entered into an agreement whereby the receiver went into possession of the bankrupt's property. On January 31, 1963, Manz was adjudicated bankrupt, and the same day Armstrong demanded possession of the Manz property. The demand was rejected. Meanwhile, Armstrong continued to advance funds for the operation of the Manz printing business, under agreement with the receiver. On February 15, 1963, a trustee was named. Armstrong continued to advance monies for the operation of the business by the trustee until February 19, 1963.

In the interim, on February 4, 1963, the receiver filed a petition, subsequently adopted by the trustee, to sell the bankrupt's assets. Armstrong objected to the sale, asserting an adverse claim to all of the assets by virtue of its security interest obtained on December 14, 1961, and its possession on November 21, 1962. It objected to the referee's summary jurisdiction, insisted that the receiver's possession was in Armstrong's behalf, and that without its consent the bankrupt's

assets could not be sold. It asked for determination that it was an adverse claimant and moved to dismiss the petition to sell the assets. The trustee responded that the security transactions underlying the claim were invalid, denied Armstrong was a bona fide adverse claimant, and prayed for subordination of Armstrong's claim to the claims of all general creditors.

The referee's order[3] on November 27, 1963, denied Armstrong's motion to dismiss, declared the security transactions void as liens, claims, or encumbrances, subordinated the Armstrong claim in its entirety to all other claims filed and allowed, and directed the trustee to sell the assets free and clear of Armstrong's claims. Armstrong petitioned for review of this order and a subsequent order implementing the direction to sell. The district court, in an exhaustive opinion, adopted and affirmed the referee's findings of fact and conclusions of law, and denied the prayer of the petition for review. 236 F.Supp. 333, 350.

The vital question presented by Armstrong is whether the referee in bankruptcy had jurisdiction to invalidate the security transactions between Armstrong and the bankrupt, and to subordinate Armstrong's claim to those of all general creditors. It contends the referee should have conducted a preliminary hearing on the issue of its claim to adverse possession, and that he erred in hearing and deciding the merits of the claim.

The district court's opinion held adversely to this contention on the grounds that Armstrong recognized the possession of the court, and rendered its demand for possession "in effect a reclamation petition," when on January 31, 1963, Manz was adjudicated bankrupt, and Armstrong sought return of possession.

---

2. Prior to this date Armstrong required and received, as collateral for the proposed loan, all of the interest and rights to the shares of stock of Manz and a contract for the assignment of all of Manz's accounts receivable. See the district court's opinion, 236 F.Supp. at 338, for distribution of the proceeds of this loan.

3. The hearing upon the trustee's petition, Armstrong's motion and trustee's response began April 1, 1963. The parties agree that the order on appeal, entered November 27, 1963, is in 66 pages and was preceded by 33 hearings with over 3,000 pages of testimony and over 125 exhibits.

**516**

from the trustee; that whatever possession Armstrong may have had on November 21, 1962, was surrendered to the receiver when he went into physical possession of the property; and that Armstrong had participated in the hearing in the district court on review of the appointment of receiver and had consented thereby to the summary jurisdiction. The district court affirmed the referee's orders. We think this was error.

■ The agreement between Armstrong and the receiver shows that in surrendering possession Armstrong did not relinquish its adverse claim. It is true that the district court rejected a provision of the agreement between Armstrong and the receiver which required the receiver to restore Armstrong to the same position it had at the time the bankruptcy petition was filed, but the referee's order of December 7, 1962, provided *inter alia* that "the rights of and questions of jurisdiction as to, and possession of A. J. Armstrong Company, Inc., shall be considered and determined in all respects as of the time of the filing of the above proceedings. * * * " Furthermore, the order provided that neither the receiver nor Armstrong would be prejudiced in making or advancing any contention with respect to possession, jurisdiction, and other matters not pertinent. Moreover, Armstrong necessarily recognized possession in the court when it requested a return of the property in accordance with its agreement with the referee. It persisted in this request, as it had from the beginning in its claim of adverse possession and denial of summary jurisdiction of the referee. And we have read the transcript of the proceeding before the district court on review of the appointment of receiver and are unable to agree with the district court that in its appearance and participation there Armstrong backed off from its resistance of summary jurisdiction, or consented to the referee's decision upon the merits.

■ The basic concept underlying summary jurisdiction is possession of the property. 5 Moore, Federal Practice ¶ 38.30 [3], at 219 (2d ed. 1964). The bankruptcy court has power in the first instance to determine whether it has actual or constructive possession essential to its jurisdiction to proceed. Harris v. Avery Brundage Co., 305 U.S. 160, 163, 59 S.Ct. 131, 83 L.Ed. 100 (1938).

■ It is well settled, however, that a bankruptcy court is without jurisdiction to summarily adjudicate a controversy over property held adversely to the bankrupt estate without consent of the adverse claimant; that mere assertion of an adverse claim does not oust the court of its summary jurisdiction; that a preliminary determination should be made as to whether the claim is real and substantial or merely colorable; that if merely colorable the court may proceed to adjudicate the merits summarily, but if otherwise it must dismiss the summary proceeding; and that an actual claim may be adverse and substantial even though in fact fraudulent and voidable. Harrison v. Chamberlin, 271 U.S. 191, 193–194, 46 S.Ct. 467, 70 L.Ed. 897 (1926); Cline v. Kaplan, 323 U.S. 97, 98–99, 65 S.Ct. 155, 89 L.Ed. 97 (1944); In re Kansas City Journal-Post Co., 144 F.2d 812 (8th Cir. 1944). See generally 2 Collier, Bankruptcy ¶ 23.07 (14th ed. 1964).

The bankruptcy court is without summary jurisdiction to determine a claim without the claimant's consent where it is necessary to weigh the force of opposing credible evidence on a substantial and controverted issue of controlling fact. In re Kansas City Journal-Post Co., 144 F.2d at 815. A claim is substantial if it " 'discloses a contested matter of right, involving some fair doubt and reasonable room for controversy,' * * * in matters either of fact or law; and is not to be held merely colorable unless the preliminary inquiry shows it is so unsubstantial and obviously insufficient, either in fact or law, as to be plainly without color of merit, and a mere pretense." Harrison v. Chamberlin, 271 U. S. at 195, 46 S.Ct. at 469. The Supreme Court there found the objection to summary jurisdiction well taken because the validity of the claim depended upon dis-

puted facts as to which there was a conflict of evidence and a controversy in a matter of law.

This court gave early expression to the same rule in In re Goldstein, 216 F. 887 (7th Cir. 1914), i.e., that the bankruptcy court may proceed summarily to the point of ascertaining whether the claim has substance or not. "But substantiality appears as soon as the claimant, in response to the rule to show cause, presents his verified answer, which is unmet by the trustee, or which, if met by a replication, is supported by sworn testimony of facts which, *if true,* would show title and possession antedating the petition in bankruptcy." 216 F. at 888–889. (Emphasis added.) See also 6 Moore, Federal Practice ¶ 56.04 [3] (2d ed. 1965).

■■ It is clear to us that at no time from the beginning to the end of the proceeding before the referee did Armstrong submit to the summary jurisdiction of the court in the disposition of its claim. From the beginning of the hearing of testimony the referee insisted upon hearing all of the evidence, and did not rule on Armstrong's objection to summary jurisdiction until making its decision as well upon the merits. It is true that had Armstrong participated, instead of refusing, as its claims, to participate in the complete hearing, and presented all of its evidence, it would not have waived the question of jurisdiction. Cline v. Kaplan, 323 U.S. 97, 65 S.Ct. 155 (1944). On the other hand, it was not required to participate on the merits, but was entitled to take the risk that if it was wrong on the jurisdictional question it would ultimately have judgment entered against it upon the evidence that was adduced before the referee. Accordingly, we hold that Armstrong did not consent to summary jurisdiction and that the referee should

not have assumed jurisdiction to hear all of the evidence in order to determine whether the Armstrong adverse claim was substantial or merely colorable.

We need not discuss cases relied on by the trustee, to affirm the judgment, where there was no controversy over facts or law. This case is not of that kind. And cases cited by the trustee, such as American Mannex Corp. v. Huffstutler, 329 F.2d 449 (5th Cir. 1964) (where the court, not the referee, was held to have correctly decided there was no arguable factual basis for the claim), and Buss v. Long Island Storage Warehouse Co., 64 F.2d 338 (2d Cir. 1933), applied the rules we have stated above to facts widely different from those before us.

■■ The referee here found that the transfers of December 14, 1961, between Armstrong and the bankrupt were fraudulent and void under Sec. 67(d) (2) (b–c–d) of the Bankruptcy Act, 11 U.S.C. § 107(d) (2) (b–c–d), and under certain provisions of the Illinois Fraudulent Conveyancing Act and Illinois Business Corporation Act, made part of federal law by Sec. 70(e) of the Bankruptcy Act, 11 U.S.C. § 110(e). The pleadings of a receiver or trustee claiming fraud do not of course subject an adverse claimant to summary jurisdiction over the latter's objection. 2 Collier, Bankruptcy ¶ 23.06 [9], at 517 (14th ed. 1964).

In determining there was fraud the referee went beyond the limit for determination of summary jurisdiction. He erroneously thought he should hear all the evidence. He considered the circumstances under which the security interest instruments were entered into to determine whether Armstrong's claim was valid. In finding fraud he made credibility decisions.[4] He went too far afield

---

4. We need quote only part of the first of his forty "Conclusions":

1. Except to the extent that it is corroborated by credible witnesses or by documentary proof, the Court rejects as unworthy of credit the testimony of Armstrong's witnesses, Greenspan, Hirsch, Rubin, Spoleti and Fine for one

or more of the following reasons: (1) their interest as officials or employees of Armstrong (with respect to all five); (2) their demeanor on the witness stand (with respect to Rubin, Spoleti and Fine); (3) the self-contradiction contained within their own testimony or documents previously prepared by them

from the initial inquiry, which the cases contemplate, concerning summary jurisdiction. He fused the inquiry into his summary jurisdiction with a trial of the merits. He concluded the inquiries simultaneously eight months after Armstrong undertook to show its adverse claim had substance.[5]

Whether a letter of Armstrong modifying the chattel mortgage by agreeing to fifteen day notice of default nullifies Armstrong's possession of the Manz chattels is a question for a plenary suit, as is the question of the propriety of its seizure of the Manz realty under the trust deed. The questions of the validity of the mortgage transactions in themselves, and of the validity and treatment of the underlying loan secured by the mortgages, having odors of fraud, may not be aired in the summary proceeding since the documents in themselves have appearances of honesty and arm's length dealing. And the truth of the testimony of Armstrong's officers is not for the referee in a preliminary inquiry into the substantiality of the adversity of the Armstrong claim.

in connection with the transaction of December 14, 1961 (Greenspan, Hirsch and Rubin); (4) their evasive answers and their professed inability to recall significant facts likely to be documented and not likely to be easily forgotten (with respect to Greenspan, Hirsch and Rubin); (5) inherent improbabilities in their testimony (with respect to all five); (6) their contradiction by credible witnesses on behalf of the trustee who were without interest in the result of this litigation, including witness Roskin, a guarantor of the $2,500,000 loan who testified adversely to his interest (with respect to all five witnesses); and (7) the hesitating and backtracking manner of their testimony evidencing a lack of candor and a willingness to conceal information detrimental to Armstrong's case (with respect to Greenspan, Hirsch, Rubin and Spoleti).

The trustee recognized in his brief that: "The Referee credited Margolies' version of the discussions preceding the seizure and discredited the versions given by Rubin and Spoleti (A. 180, 182), upon which Armstrong's contentions are based."

5. See note 3 supra.

It is no justification for the referee's exercise of summary jurisdiction to state that the adverse decisions relied on by Armstrong in support of its appeal are inapposite because they "involved an unlawful possession." This begs the question. Unless the security transactions on which Armstrong's claim rested show mere colorability on their faces, Armstrong was entitled to a plenary trial. See In re Kansas City Journal-Post Co., 144 F.2d at 813–14. The testimony which Armstrong adduced in support of its claim should have been taken as true. In re Goldstein, 216 F. 887 (7th Cir. 1914).

We hold that the referee in bankruptcy, the bankruptcy court, was ousted of summary jurisdiction at that point where Armstrong's testimony, taken as true, and its exhibits, not merely colorable on their faces, showed prima facie a substantial claim; that the referee could proceed no further thereafter, 2 Collier, Bankruptcy ¶ 23.07 [1], at 523–24 (14th ed. 1964); and that the trustee must be remitted to the ordinary court for plenary trial of its challenge to Armstrong's adverse claim.[6]

6. The trustee filed a plenary suit in the district court in January, 1965, seeking to set aside the alleged fraudulent security transactions. This was done to toll the statute of limitations. Armstrong filed its answer in February of 1966, together with several counterclaims against the trustee and others. This is not pointed out to buttress this opinion in any way, but merely to show that the parties should be ready to proceed expeditiously in accordance with the mandate. It is unfortunate that the prolonged hearing must go largely for naught. This, however, is not Armstrong's fault. Had the referee dismissed the summary proceeding at the proper point, the ultimate settlement of the bankrupt estate would not have been postponed for so long a time. See comment of Judge Learned Hand in Ford v. Magee, 160 F.2d 457, 460 (2d Cir.), cert. denied, 332 U.S. 759, 68 S.Ct. 58, 92 L. Ed. 345 (1947). The early settlement of that estate ought to be the goal of the parties in framing the issues and of the district court in scheduling the plenary suit for trial.

This holding is of course no barrier to the referee's summary disposition of claims with respect to property over which Armstrong took possession but which it obviously had no right to possess, cf., Thompson v. Magnolia Co., 309 U.S. 478, 483, 60 S.Ct. 628, 84 L.Ed. 876 (1940), such as that explicitly excluded from Armstrong's chattel mortgage and that in which the bankrupt had but an equity under conditional sales contracts [7] made with the seventeen reclamation petitioners in this proceeding.[8]

The judgment of the district court is reversed. The cause is remanded with direction to dismiss the summary proceeding against Armstrong to the extent that this opinion holds that the trustee must be limited to a plenary suit against Armstrong.

SWYGERT, Circuit Judge (dissenting).

If only because of the long and wasteful delay of a final disposition of this proceeding already incurred and now extended beyond prediction, it is unfortunate that this court's decision gives preference to form over substance.

On November 23, 1962 an involuntary petition in bankruptcy was filed against the bankrupt. Three days later a receiver was appointed and directed to take possession of Process-Manz' property. On April 1, 1963 the trustee's petition to sell the bankrupt's property came on for hearing before the referee. Eight months later, after thirty-three separate hearings (The record consists of some 3,000 pages of transcript and 125 written exhibits.), the referee ordered a sale to be held on February 11–15, 1964. The sale was stayed, however, upon Armstrong furnishing supersedeas bonds pending review. Now, more than three years after the debtor was adjudicated a bankrupt, this proceeding is back where it started in November 1962, and the trustee is faced with the task of adducing in a plenary suit the same evidence against Armstrong's asserted liens which was submitted to the referee and upon which it was found that the transaction of December 14, 1961, whereby the bankrupt executed to Armstrong a trust deed and a chattel mortgage covering its property in return for a loan of $2,500,000, was fraudulent as to creditors, and that Armstrong's claim should be subordinated to the claims of the other creditors. The district judge, after reviewing the evidence, affirmed the referee's determination, and in his opinion characterized Armstrong's conduct as "unfair, inequitable, unconscionable and fraudulent * * in its transaction with Manz to the detriment and damage of its creditors." In re Process-Manz Press, Inc., 236 F.Supp. 333, 348 (N.D.Ill.1964).

The referee properly exercised summary jurisdiction on two equally valid grounds.[1] First, Armstrong voluntarily submitted to summary jurisdiction by actively participating in the administrative phases of the proceeding. Armstrong appeared by counsel at the hearing before the referee on the motion for the appointment of a receiver on November 26, 1962. Its counsel also appeared before the district judge the next day when a petition to review the granting of the motion was considered. At that time Armstrong's attorney urged that the referee's appointment of a receiver be va-

---

7. Several appellee briefs were filed in this court on this appeal on behalf of reclamation petitioners and general creditors, urging the affirmance of the court's judgment. We deem it unnecessary, in view of the result reached in our opinion, to treat separately the points made.

8. As the district court held, 236 F.Supp. at 345:

The Referee correctly ruled that by reason of the explicit exclusion of the inventory, work in process and raw materials from Armstrong's chattel mortgage, rendered any claim to possession of that property without any color of right. * * * Armstrong, likewise, had no basis to claim the substantial amount of third party property which is the subject matter of seventeen reclamation petitions filed in this proceeding.

1. The referee's findings and conclusions most pertinent to jurisdiction are included in an appendix to this dissent.

cated and that the debtor be allowed to be in possession. On December 7, 1962 an order was entered by the referee with the consent of Armstrong's counsel which provided that the rights of Armstrong to possession and "questions of jurisdiction" be considered and determined as of the time of the filing of the involuntary petition in bankruptcy. This order was entered only after a suggested order was rejected by the referee which provided that Armstrong be restored to possession in the event the debtor was adjudicated a bankrupt and which Armstrong and the receiver had agreed upon. When the referee rejected the proposed order, Armstrong, rather than demanding that it be restored to the possession which it claimed, agreed to permit the receiver to continue in possession under the modified order.

Second, Armstrong's possession of the bankrupt's property between November 21 and November 27, 1962 was unlawful. Actual or constructive possession in the adverse claimant is not alone sufficient to deprive the bankruptcy court of summary jurisdiction. As the Fifth Circuit said in American Mannex Corp. v. Huffstutler, 329 F.2d 449, 451 (5th Cir. 1964) (fn. 4), "Possession, actual or constructive, is * * * inconsequential. The important thing is the lawful, rightful character of that 'possession'." Here Armstrong without legal justification seized all the property of the bankrupt, including real estate, inventory (expressly excluded from Armstrong's chattel mortgage), and property which had been sold to the bankrupt by third parties on conditional sale. It is also significant that at the time of the seizure the bankrupt was merely the alter ego of Armstrong. (The referee found that by Feb-

ruary 27, 1962 Armstrong had acquired one hundred per cent of the stock of Manz.) Courts of bankruptcy ought not be ousted of summary jurisdiction in these circumstances.

Armstrong's principal contention is that the referee should have conducted a preliminary hearing on summary jurisdiction and decided that question before attempting to proceed on the merits. The answer is that in the factual context of this case the questions of jurisdiction and the merits intertwine; in the words of Judge Learned Hand in Buss v. Long Island Storage Warehouse Co., 64 F.2d 338, 339 (2d Cir. 1933), "the two coalesce."

Finally, Armstrong was not prejudiced either by the referee's failure to make a preliminary ruling with reference to jurisdiction or by his proceeding to hear the claim on its merits. Armstrong's attorney at all times understood that the referee was hearing the matter fully, reserving the question of jurisdiction. A full and complete hearing was conducted in which Armstrong participated and offered evidence. "Summary procedure fairly conducted is not a denial of due process."[2] Armstrong's contentions that it was deprived of a jury trial and the right to implead third parties are afterthoughts and purely specious. The distinction between a summary hearing and a plenary suit in these circumstances is of no practical or substantive significance. This case ought not turn on the mere linguistic character of the distinction.[3]

In summary, I do not believe that Armstrong is entitled to relitigate issues that were fully heard and decided by the referee and affirmed by the district court. Recently the Supreme Court observed in Katchen v. Landy, 382 U.S. 323, 328, 86

---

2. Shor v. McGregor, 108 F.2d 421, 424 (5th Cir. 1939) (concurring opinion).

3. In this connection the following observation of Judge Sanborn is pertinent:
   While such controversies over jurisdiction may be of some academic interest to the legal profession, they are profitless to litigants and wasteful of the assets of bankrupt states. Certainly

something can be done toward making the jurisdiction of the courts of bankruptcy, with respect to such controversies, more definite and certain than it is at present.

Sanborn, Committee Report to National Judicial Conference, August 21, 1944, quoted in MacLachlan Bankruptcy § 195 n. 24 (1956).

S.Ct. 467, 472, 15 L.Ed.2d 416 (1966), in which the exercise of summary jurisdiction was sustained, "this Court has long recognized that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period' * * *."

I would adopt the reasoning of the district judge and affirm the judgment.

### APPENDIX TO DISSENTING OPINION

### Portions of Referee's Findings and Conclusions

The Instalment Note for $2,500,000 dated December 14, 1961 contains two paragraphs on page 3 of said Note relating to the right of the holder of the Note to accelerate the indebtedness due on the occurrence of events of default. The first paragraph of the Note provides that in case of default of any payment of principal or interest, or other indebtedness owing by debtor, 15 days notice must be given before acceleration can be made. The paragraph which immediately follows provides that in the event of any default under the terms of the chattel mortgage or Deed of Trust securing the Note, acceleration may be made immediately. The provision of the chattel mortgage provides, among other things, that acceleration of the indebtedness not yet due may be made when the holder thereof deems the security unsafe and then it shall and may be lawful for the holder of the mortgage to enter and take possession of the mortgage chattels. On the same date, to-wit, December 14, 1961, as a condition of delivery of the Note, Chattel Mortgage and Trust Deed, Armstrong delivered to Manz a letter which stated as follows:

"Reference is hereby made to the Instalment Note in the sum of $2,500,-000 this date being executed by you and being delivered to us.

With respect to the third paragraph on page 3 of said Note, which gives the holder the option, on the happening of default under the Chattel Mortgage or Trust Deed, to accelerate the principal sum owing, we do hereby agree with you that such option to accelerate the principal may be exercised by us only if said default continues for a period of fifteen (15) days after the sending of notice thereof to you by registered mail."

No notice was ever given by Armstrong to Manz.

\*      \*      \*      \*      \*      \*

On November 26, 1962 Francis J. Curtis was appointed Receiver. Upon a review of the order appointing the Receiver, at a hearing before the Honorable William J. Campbell, Chief Judge of the United States District Court, Armstrong, through its attorney Harry Margolis, stated that his appearance was special on behalf of Armstrong, but addressed the Court at length in opposition to the appointment of a receiver and in support of the continued operation of the business of the Bankrupt by the Bankrupt as "debtor in possession." He stated:

"We did not foreclose. We never intended to foreclose. We never intended to wipe out anybody's rights. It was always our intention to protect the unsecured creditors with any possible equity which would exist if the company continued to operate. * * *"

"We informed them that in order to protect the assets for everybody, we were just going to take possession, because the debtor had talked about filing a Chapter XI, but did not get around to filing it, and the fact they didn't get around to filing it of necessity to protect everybody's interest, we took possession and said, 'Now, let us sit down and see how we can carry on the operation so that this thing can have continuity.'"

He proposed that Armstrong finance the operation by the debtor at an interest rate of 7% per annum, which is the rate charged by Armstrong to the Receiver and Trustee during their operations. He further stated that the creditors were fully informed of the actions of Armstrong. This latter statement is not sup-

ported by the record, and the Court finds that creditors were not informed of Armstrong's intentions but that Armstrong's actions were contrary to the understanding and agreement reached between the Bankrupt, its creditors and Armstrong in the meeting of November 15, 1962.

On November 27, 1962 a conference was held between some of the creditors (at which counsel for the petitioning creditors was absent), counsel for the Receiver and counsel for Armstrong. At this meeting it was agreed that the Receiver would resume operation of the Bankrupt's business, that Armstrong would furnish funds for such operation and that the unfinished work in process would be completed. Armstrong agreed to advance $40,000 to the Receiver as a cost of administration and agreed to make further advances against receivables generated by the Receiver's operation. Armstrong agreed to withdraw the Pinkerton guards and on the evening of November 27, 1962 the guards were dismissed. Other agreements were also reached and all of the agreements were to be embodied in a petition and presented to the court for ratification and approval. The Receiver commenced operation of the business of the Bankrupt on the following day, November 28, 1962.

On December 6, 1962 a petition of the Receiver, jointly prepared by counsel for Armstrong and counsel for the Receiver, was presented to the Court for approval. It provided, inter alia, for an order approving the financing agreement between Armstrong and the Receiver which enabled the Receiver to resume operation of the business of the Bankrupt. It also provided that the use of the equipment and premises of the Bankrupt by the Receiver should be on condition that in the event of adjudication, the Receiver would be required to return the physical possession of the property to Armstrong. Provision for such return was likewise incorporated in an order. On December 6, 1962, upon presentation of the petition and order, the Court rejected approval and ratification of the order, objecting to

the provisions for delivery of the property to Armstrong on the happening of certain conditions and pointing out he was not bound by any agreement of the parties on this subject. At that time the Court offered to immediately hear the parties on any claim of adverse possession by Armstrong. On the afternoon of December 6, 1962 a conference was held between counsel for the Receiver, counsel for Armstrong, and the Referee. A new order was drafted based upon the petition previously presented and the agreement reached at the meeting with the Referee. This new order was presented to the Court on December 7, 1962. The new order, after further amendment, and by agreement with Armstrong's counsel, was signed by the Court. The new order provides for the rights of Armstrong to be determined as of the time of the filing of the petition in bankruptcy herein. The order, as signed, does not provide for the Receiver to deliver any of the property of the Bankrupt to Armstrong.

The Receiver continued to operate the business of the Bankrupt after November 28, 1962 on the basis of his financing agreement with Armstrong. The Bankrupt was unable to effect an arrangement with creditors. Its petition for an arrangement filed on November 26, 1962 was dismissed on January 31, 1963. An order of adjudication was entered on that date. On that same date Armstrong's counsel wrote a letter to the Receiver demanding possession of the premises and property of the Bankrupt in behalf of Armstrong. This demand was refused by the Receiver, who continued to operate the business until February 15, 1963 with financing furnished by Armstrong. On that date Francis J. Curtis was appointed Trustee. Armstrong objected to the Trustee's petition for leave to operate the business of the Bankrupt which was filed on February 20, 1963. On February 18, 1963 Armstrong in a letter to the Trustee agreed to his continued operation of the business and it continued until February 19, 1963, to furnish the finances for the operation of the business of the Bankrupt by the Trustee.

\* \* \* \* \* \*

The provisions of the letter of December 14, 1961 in modification of and delivered at the same time that the Note, Chattel Mortgage and Trust Deed were delivered, modified the printed provisions of the Chattel Mortgage instrument and also modified the third paragraph of the Instalment Note which appeared on page 3 of said Note and required Armstrong to give Manz fifteen (15) days notice by registered mail before it could accelerate the indebtedness which was not yet due and before it could take possession as provided for in said chattel mortgage instrument. In considering further, no such notice was given by Armstrong prior to the alleged taking of possession on November 21, 1962; that said possession so taken was in violation of the agreement made by Armstrong with Manz and that such alleged possession was illegal and of no effect as against the rights of the Trustee in bankruptcy herein.

\* \* \* \* \* \*

The claim of Armstrong to be considered in adverse possession of the premises and property of the Bankrupt by reason of the allegations in the petition of December 6, 1962, must be rejected on the basis of the record, which clearly discloses that the original proposed order presented to the Court for entry on December 6, 1962 containing the agreement relied upon by Armstrong was rejected by the Court, and a new order presented which eliminated that provision of the proposed order relied upon by Armstrong. That new order was signed by the Court on December 7, 1962 without objection by Armstrong, and by agreement of its counsel, and its provisions must be regarded as controlling in the absence of any review. This order signed by the Court provides that Armstrong would be given the right to claim to be in adverse possession as of the time of the filing of the petition and this right was accorded to Armstrong by the Court.

Armstrong's claim to have been in adverse possession of the premises and property of the Bankrupt at the time of the filing of the involuntary petition herein must be considered in the light of the actual physical and exclusive possession by the Trustee and on the basis of the character of the property claimed by Armstrong to be in its possession. The real estate owned by the Bankrupt, which was transferred by the trust deed, is clearly not subject to foreclosure by a mere taking possession but requires foreclosure proceedings in a court of law. Smith-Hurd Illinois Statutes, Ch. 95, par. 23, prohibits a power of sale in a real estate mortgage. No such power is contained in the trust deed in question. The remedy provided in the trust deed is by way of foreclosure in a court. The real estate of the Bankrupt is accordingly within the summary jurisdiction of this Court, and not subject to Armstrong's claim of adverse possession.

The chattel mortgage specifically excludes from its provisions, inventory and work in process, which are of substantial value in this case. Such property cannot be, and is not, subject to Armstrong's claim of adverse possession. There likewise appears to be a very substantial amount of machinery and equipment on the premises which is not included in the chattel mortgage of Armstrong.

Another substantial amount of property contained in the premises of the Bankrupt consists of third party property. Seventeen claimants filed reclamation petitions asserting that they had sold specific equipment to Manz either under conditional sales contracts or secured by chattel mortgages. As to those items sold under conditional sales agreements, Armstrong has no color of right, or claim. Such property is within the summary jurisdiction of the Court.

A further category of property of the Bankrupt which is clearly not subject to Armstrong's claim of adverse possession is the substantial amount of accounts receivable which were financed upon a nonnotification basis, collected by the Bankrupt and remitted to the finance company. Such accounts receivable are within the summary jurisdiction of this Court.

Armstrong's active participation in the proceeding such as the statement of its counsel, Harry Margolis, to the District Court on November 27, 1962, objecting to the appointment of a receiver and proposing operation by a debtor-in-possession and Armstrong's arranging for the filing of the Chapter XI proceedings by offering to pay the fee of counsel for the debtor coupled with Armstrong's negotiations with creditors prior to the Order of Adjudication regarding a Plan of Arrangement and an offer of settlement to creditors, constitutes Armstrong a party to the proceedings in like manner as if a general appearance were filed. Armstrong's submission of evidence on the hearings which went beyond actual proof of its mortgage indebtedness and possession likewise constitutes a submission to the jurisdiction of the Court.

Armstrong's claim to be considered to be in adverse possession of the premises and property of the debtor must be considered in the light of the record disclosing its acts and doings on November 21, 1962 in posting guards at the main entrance and in locking all outer doors to the Manz building. The Manz building occupied in excess of one-half of a square city block. There was no identification, segregation or tagging of the machinery and equipment or personal property located on the many floors within the plant included in Armstrong's chattel mortgage. The acts of Armstrong in attempting to take possession, as stated above, consisted merely in posting guards at the entrance of the plant and in changing locks to numerous doors to the plant. By such grab-law tactics Armstrong claims possession of the entire building, which contained the property of six tenants, the free property not covered by its mortgages and the third party property likewise not covered by the mortgage. Armstrong's agents did not have the chattel mortgage with them on November 21, 1962, the date of the purported taking of possession, in order to identify the property included in the mortgage. No notice of sale or inventory was posted; the signs put up merely stated that Armstrong was taking possession of the premises and machinery, equipment and personal property in the plant. Armstrong's acts and doings of November 21, 1963 were not sufficient to constitute taking of possession of the property described or included in its mortgage located within the Manz plant sufficient to oust the Bankruptcy Court of summary jurisdiction over such property of the Bankrupt.

Armstrong's claim to exclusive possession is not substantiated and is clearly contradicted by the record, which discloses the following: (a) the presence of six tenants and their employees and (b) the presence of the Bankrupt's employees including Myron Laden, the office personnel, the maintenance men, engineers, guards with uniforms containing the Manz name. All of these employees were present in the plant at various times, performing their regular duties, in the employ of the Bankrupt. The operation of the bindery department on November 23, 1962 and the shipment of the Allen Lithographing job for Jewel Tea Co. and Pabst Co. on the night of the same day renders Armstrong's claim to exclusive possession clearly untenable. Armstrong sent $30,000 to the Bankrupt on Friday, November 23, 1962. Myron Laden assigned an account receivable on November 22, 1962 to Armstrong after the time of its claimed possession. Armstrong's possession was clearly not exclusive, but ambiguous, and in such case any doubt must be resolved against the mortgagee and in favor of the mortgagor's possession. Such possession of the mortgagor would pass to the Trustee by operation of law as of the time of the involuntary petition filed on November 23, 1962.

Armstrong's claim to adverse possession must also be considered in the light of the record of its relationship with the Bankrupt which was not that of an ordinary borrower and secured lender on an "arms-length" basis. Armstrong had complete control over all income of the Bankrupt, held all of the capital stock of the Bankrupt, with blank endorsements, under the terms of a loan with which the Bankrupt could not comply. These fac-

tors, together with the absence of any control or direction by the Board of Directors or the shareholders of Manz, coupled with the control over the purse strings of the Bankrupt by Armstrong, placed it in the position of a principal and the Bankrupt in the position of its agent. The purported taking of possession by Armstrong was in fact, the act of a principal, taking its own property into its possession, in an illegal attempt to prevent the administration of the assets of the Bankrupt by the bankruptcy court. Armstrong's attempt to take possession on November 21, 1962, a few days after making commitments to the creditors on November 15, 1962, at the meeting of creditors on that date and in violation thereof, together with Armstrong's decision that it would first take possession before the filing of a Chapter XI proceeding by the debtor and its threat to cut off all finances if the Bankrupt filed a Chapter XI proceeding before Armstrong could take possession (testified to by Michael Margolies), constitutes a fraud on creditors and on the Bankruptcy Act such as to require denial of its claim to adverse possession.

Armstrong's claims to adverse possession must also be considered in the light of the status of the bankruptcy proceeding at the time of the filing of its motion claiming adverse possession on February 14, 1963. This Court offered to adjudicate the controversy over possession at the commencement of these proceedings in early December, 1962. That offer was rejected by Armstrong. Thereafter Armstrong made possible the Receiver's resuming the operation of the business of the Bankrupt by providing the necessary financing. Such funds were continued to be furnished not only to the Receiver, but to the Trustee after the Order of Adjudication on January 31, 1963, and after the motion of Armstrong was filed on February 14, 1963. During the pendency of these proceedings numerous reclamation petitions were filed. General unsecured claims in excess of One Million Dollars have been filed. Wage claims in excess of $40,000 have been filed. Tax claims of approximately $140,000 have been filed, including a claim by the United States of America in the sum of $107,000. All of these claims have been filed in accordance with the provisions of the Bankruptcy Act on the basis that this Bankruptcy Court was administering the assets of the Bankrupt in the usual and normal bankruptcy administration. The rights of all of the foregoing third parties have become affected to such a point that it would constitute a gross miscarriage of justice to recognize at this late stage in these proceedings the claim of Armstrong to the right of adverse possession. Recognition of that claim would require the Court to simply turn over all of the property in this estate to Armstrong. The rights of these third parties are additional grounds for this Court to retain jurisdiction to administer all of the property of the Bankrupt.

Armstrong's claim to adverse possession is essentially a claim to the right to administer all of the assets and property of the Bankrupt estate located within the Bankrupt's plant free of interference by the Bankruptcy Court. It is an illegal attempt to take over a going business, including assets not covered by its mortgages and which it had no legal right to take into its possession. The purported possession of Armstrong of the premises and property of the Bankrupt is inferior to the paramount right of this Bankruptcy Court to administer all of the assets of the Bankrupt for the benefit of all creditors of the estate.

Armstrong has failed to sustain the burden of proof of its allegations in its motion that it is, or was, prior to bankruptcy, in adverse possession of the premises, machinery, fixtures, equipment or personal property of Manz, the Bankrupt herein.